THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v LARRY DAVIS, Defendant.

Supreme Court, Bronx County, December 15, 1988

884

### APPEARANCES OF COUNSEL

*Paul Gentile, District Attorney (William Flack* and *Brian Wilson* of counsel), for plaintiff. *William M. Kunstler* and *Lynne F. Stewart* for defendant.

### OPINION OF THE COURT

BERNARD J. FRIED, J.

Defendant, a black man, is charged with the attempted murder of nine white and Hispanic police officers. During the first three rounds of jury selection, defense counsel peremptorily challenged all eight white prospective jurors who had not been excused for cause. Thus, at the end of the third round, 6 black and Hispanic jurors had been selected and sworn, and an additional 2 black jurors selected. At this point, the People moved, under *Batson v Kentucky* (476 US 79 [1986]), to require the defense to provide racially neutral explanations for their peremptory challenges of white prospective jurors. I granted the People's motion, holding that the procedures of *Batson*

apply to the defense, and that in accordance with those procedures, defense counsel was required to satisfactorily explain the suspect peremptory challenges. I heard the defense explanations, over the People's objection, both in camera and ex parte. Concluding that at least 3 of the 8 explanations of the suspect challenges were not legitimately racially neutral, I held that the People had established a case of purposeful discrimination, in violation of Federal and State law, and therefore discharged the entire venire, including the six sworn jurors.

During the subsequent (second) jury selection, defense counsel was required to, and did, provide nonpretextual, and legitimate racially neutral reasons for their peremptory challenges of nine white prospective jurors. A jury of 11 blacks and 1 white was selected as jurors although, at the defense request, they were not sworn so that they might be discharged if an appellate court ordered that the first 6 sworn jurors be reseated. Although no appellate court ordered that the first 6 sworn jurors be reseated,[1] I subsequently discharged the second 12 selected, but unsworn, jurors when the defense moved, on grounds unrelated to *Batson (supra),* for what was described as a "mistrial", and the People consented to that relief.

At the commencement of the third jury selection, a defense motion to be relieved of my prior *Batson* ruling which required defense counsel to satisfactorily explain their peremptory challenges of white prospective jurors was denied.

This opinion is being filed to explain my reasons for each of these *Batson*-related rulings.

### I. *BATSON* PROCEDURES APPLY TO THE DEFENSE

■ Peremptory challenges, although long believed to be an integral part of the jury trial system, are not of constitutional dimension. *(Hayes v Missouri,* 120 US 68, 71-72 [1887]; *Batson*

---

1. Following my application of *Batson v Kentucky* (476 US 79) to the defense, defendant sought for a writ of prohibition. This petition was denied and dismissed *(Davis v Fried,* 140 AD2d 1008). Subsequently, an order to show cause was denied by the New York Court of Appeals (May 17, 1988). Thereafter, an application to the Appellate Division to reseat the six sworn jurors also was denied (140 AD2d 1008, *supra).* Another show cause order was denied by Court of Appeals (May 26, 1988). A habeas corpus petition in the United States District Court for the Southern District of New York was denied and dismissed on June 1, 1988 *(Davis v Lansing,* 88 Civ 3671 [Ward, J.], *affd* 851 F2d 72 [2d Cir 1988]).

*v Kentucky,* 476 US, *supra,* at 108 [Marshall, J., concurring]; *People v Lubel,* 298 NY2d 243 [1948].) In New York, such challenges are a privilege granted by statute, which fixes the number of peremptory challenges available in a particular case and the manner in which they may be used, and defines them as "an objection to a prospective juror for which no reason need be assigned" (CPL 270.25 [1]). In *Batson,* however, the Supreme Court limited the prosecutor's use of peremptory challenges, holding that the Equal Protection Clause of the Fourteenth Amendment prohibited a State prosecutor from exercising peremptory challenges solely on the basis of race. The court required the defendant to first make a prima facie showing of purposeful discrimination by the prosecutor, and, once that showing was made, the burden shifted to the State to rebut the inference of discrimination by articulating non-pretextual, racially neutral reasons for the suspect peremptory challenges. The threshold issue, here, is whether these procedures also apply to the defense, thereby limiting a defendant's exercise of peremptory challenges. For the following reasons, I conclude that under both the Federal and State Constitutions, as well as a matter of State law, a defendant's exercise of peremptory challenges is so limited.

## A. *Equal Protection*

■ *Batson (supra)* held that a State prosecutor's racially discriminatory use of peremptory challenges was prohibited by the Equal Protection Clause of the Fourteenth Amendment. Defendant argues that the Equal Protection Clause cannot be the basis for the same restriction on defense peremptories since the actions of defense counsel do not constitute "State action" which is a substantive requirement of all equal protection claims. I reject this argument for the reasons stated in *People v Muriale* (138 Misc 2d 1056 [Sup Ct, Kings County 1988, Juviler, J.]) and *People v Gary M.* (138 Misc 2d 1081 [Sup Ct, Kings County 1988, Kramer, J.]; *but see, Holtzman v Supreme Ct.,* 139 Misc 2d 109 [Sup Ct, Westchester County 1988, Rosato, J.]). The implementation of racially discriminatory defense peremptory challenges constitutes State action, not because the defense attorneys are paid by the State pursuant to County Law article 18-B,[2] but rather, because the

---

2. Of course, the actions of State-funded defense lawyers do not, because of that funding, constitute State action under the Federal civil rights statutes with respect to the representation function. (*E.g., Polk County v Dodson,* 454 US 312 [1981].)

Trial Judge and other State officials must participate, facilitate and acquiesce in the racial discrimination. *(Matter of Wilson,* 59 NY2d 461, 476 [1983]; *People v Muriale,* 138 Misc 2d, *supra,* at 1062.)* As Judge Juviler explained in *Muriale:* "When the clerk asks the defendant to exercise peremptory challenges, defense counsel—an officer of the court and a member of the Bar established by the State, whose profession is regulated by the courts—calls the jurors' names or numbers out, and the Judge accepts the challenges. Then in open court the Judge or clerk orders the excluded jurors to leave, and they are guided out of the room by uniformed court officers or Deputy Sheriffs. The jurors perceive the Judge as the person who is responsible for the conduct of the trial, and although they do not know whether the prosecutor, the defense lawyer or the Judge is rejecting them, they do know that officials of the State are telling them to leave. Under these circumstances, if all the black jurors—say, 9 or 10—were asked to leave but only 1 or 2 whites out of a dozen were excluded, a perception that the court was engaging in discrimination would be reasonable. If a black juror so excluded were to stop at a privately owned coffee shop in the lobby of the courthouse and were denied service because of his race, 'State action' would be found. *(See, Burton v Wilmington Parking Auth.,* 365 US 715.)* The same finding applies to racially motivated exclusion of the juror from the trial." *(Supra,* at 1062-1063.)* To me, this reasoning, as well as that of *Gary M.,* is entirely persuasive. Therefore, I held that the implementation of racially discriminatory defense peremptory challenges constitutes State action prohibited by the Fourteenth Amendment.

B. *The New York State Constitution*

■ The Equal Protection Clause of article I, § 11 of the NY Constitution is at least coextensive with the Equal Protection Clause of the Fourteenth Amendment *(Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 513 [1949], *cert denied* 399 US 981 [1950]; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d, 344, 360, n 6 [1985]), and therefore also prohibits State action implementing racially discriminatory defense peremptory challenges. *(People v Muriale,* 138 Misc 2d, *supra,* at 1063; *People v Gary M.,* 138 Misc 2d, *supra,* at 1094-1095.)* The State Constitution, however, goes further than the Federal Constitution and prohibits discrimination by private persons as well. Article I, § 11 of the NY Constitution provides: "No person shall be denied the equal

protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights *by any other person* or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state." (Emphasis added.) As this provision applies to private persons, it is violated by private acts of discrimination infringing upon the "civil rights" of another. *(Dorsey v Stuyvesant Town Corp.,* 299 NY2d, *supra,* at 531; *see also,* Civil Rights Law § 40-c [2] [which codifies this State constitutional provision].) Those "civil rights" are rights "elsewhere declared", in the Constitution, by statute, or at common law. In this case, defense counsel's action of peremptorily challenging jurors on the basis of their race deprives the excluded jurors of their civil right of jury service. Jury service is a recognized civil right because it is a "privilege of citizenship" guaranteed to each member of the State in article I, § 1 of the NY Constitution. *(People v Gary M.,* 138 Misc 2d, *supra,* at 1095, and cases cited therein.) Moreover, jury service is a civil right expressly protected by Civil Rights Law § 13, which provides: "No citizen of the state possessing all other qualifications * * * shall be disqualified to serve as a grand or petit juror in any court of this state on account of race, creed, color, national origin or sex, and any person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for any of the causes aforesaid shall * * * be deemed guilty of a misdemeanor". Consequently, I conclude that racially discriminatory peremptory challenges, whether exercised by the defense or by the prosecution, unconstitutionally deprive prospective jurors of their civil right not to be disqualified from jury service solely on the basis of their race.

### C. *Statutory Interpretation:*

■ Peremptory challenges, as earlier stated, are a privilege accorded by statute, and, as such, have no constitutional basis. Although a peremptory challenge is defined as "an objection to a prospective juror for which no reason need be assigned" (CPL 270.25 [1]), this statute must now be interpreted, in light of *Batson v Kentucky* (476 US 79, *supra),* to require the prosecutor to provide racially neutral reasons for peremptory challenges once the appropriate showing of discrimination has been made. For the following reasons, wholly aside from the unconstitutionality of racially discriminatory defense peremp-

tory challenges, I conclude that the statute should be interpreted to apply to defendants the same way.

First, the plain language of the statute does not differentiate between the prosecution and the defense; "[e]ach party" is allowed a certain number of peremptory challenges, depending upon the particular crime charged. (CPL 270.25 [2] [a].) Moreover, in New York the prosecution and the defense have been accorded equal numbers of peremptory challenges since the challenges were established in 1873. *(People v Muriale,* 138 Misc 2d, *supra,* at 1064.) The legislative intent, therefore, is clearly that the prosecution and the defense be accorded equal treatment in the use of peremptory challenges.

Such equal treatment is consistent with the right of both parties to a fair trial and an impartial jury. As the Court of Appeals stated over 100 years ago in *Stokes v People* (53 NY 164, 172 [1873]), "any act requiring or authorizing such trial by a jury partial and biased against either party, would be a violation of one of the essential elements of the jury referred to in and secured by the Constitution."

Similarly, the Supreme Court, in *Hayes v Missouri* (120 US 68, 70 [1887]), explained that "impartiality requires not only freedom from any bias against the accused, but also [freedom] from any prejudice against his prosecution. Between him and the state the scales are to be evenly held." *(See also, Singer v United States,* 380 US 24 [1965].) Therefore, allowing the defense to exclude jurors of a particular race solely on racial grounds, which a prosecutor may now not do, would violate the long-standing policy in this State of according equal treatment to the defense and the prosecution in jury selection. And it was for a precisely similar reason, in concurring with the majority in *Batson (supra),* that Justice Marshall reached the conclusion that defense peremptories should be equally restricted. (476 US, *supra,* at 108.)

Moreover, the State, which undeniably has a right to a fair trial *(Singer v United States,* 380 US, *supra,* at 37), is also entitled to a petit jury drawn from a fair cross section of the community. *(People v Muriale,* 138 Misc 2d, *supra,* at 1064.) I agree that significant policies weigh against allowing the race-based exclusion from jury service of a substantial segment of the community since, as the Supreme Court observed in a different context, but in apt language, "[w]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of

human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *(Peters v Kiff,* 407 US 493, 503-504 [1972].)* This loss, coupled with the odious nature of racial discrimination, which is contrary to the public policy of New York State *(see, People v Muriale,* 138 Misc 2d, *supra,* at 1065), can only lead to the conclusion that peremptory challenges cannot be permitted to be the judicially countenanced vehicles of racial discrimination.

For these reasons, I conclude that CPL 270.25 must be interpreted to apply equally to both the prosecution and the defense, and therefore, that the limitation imposed by *Batson (supra)* on the prosecution's peremptory challenges applies equally to the peremptory challenges of the defense.

## II. APPLICATION OF THE *BATSON* PROCEDURES

The Supreme Court, in *Batson (supra),* articulated procedures to implement its holding that the Equal Protection Clause prohibited a State prosecutor from exercising *solely* racially motivated peremptory challenges. The court required the defendant making the equal protection claim to first make a prima facie showing of purposeful discrimination by the prosecutor. Once that showing was made, the burden shifted to the State to articulate racially neutral reasons for the peremptory challenges exercised. At that point, it is the trial court's duty to evaluate the given explanations in order to determine whether the defense has met its burden of establishing purposeful discrimination.

This procedure has also been employed by courts applying *Batson* procedures to the defense, even though such an application of *Batson (supra)* is based upon State constitutional and common-law grounds as well as the Federal Constitution. *(E.g., People v Gary M., supra; People v Muriale, supra.)* I, too, believe this procedure to be appropriate when it is the defense which is alleged to be engaged in the exercise of racially motivated challenges. Therefore, I required the People to make a prima facie showing that there had been purposeful racial discrimination in the defense use of peremptory challenges. Once that showing was made, I required the defendant to articulate racially neutral reasons for the peremptory challenges exercised. Since, for the following reasons, I held that the People made the required prima facie showing of purposeful discrimination which was not rebutted by the defense explanations, I concluded that the defense had exer-

cised peremptory challenges in violation of both Federal and State law.

## A. *The Prima Facie Showing*

■ *Batson (supra)* requires the party claiming purposeful discrimination in the exercise of peremptory challenges to make a prima facie showing of that discrimination. In making that showing, the complaint is entitled to rely upon the fact that peremptory challenges, by their very nature, are susceptible to discriminatory misuse by lawyers who are inclined to discriminate. *(Batson v Kentucky,* 476 US, *supra,* at 96-97; *People v Scott,* 70 NY2d 420, 423 [1987].) Additionally, the complainant must show: (1) that he is a member of the cognizable racial group being excluded; and (2) any other relevant facts and circumstances raising an inference of purposeful discrimination. For the reasons below, I am satisfied that the People met this burden of establishing a prima facie case.

### 1. *The cognizable racial group requirement*
■ Turning to the first element of a prima facie case, I note as a threshold matter that the excluded white prospective jurors are members of a cognizable racial group. While the cognizable groups at issue in most equal protection decisions are usually racial or ethnic minorities, whites also constitute "a recognizable, distinct class [when] * * * singled out for different treatment". *(Castaneda v Partida,* 430 US 482, 494 [1977]; *see, People v Gary M.,* 138 Misc 2d 1981, *supra,* and cases cited therein; *cf., Roman v Abrams,* 822 F2d 214, 227 [2d Cir 1987] [whites are a *"Cognizable Group"* for purposes of Sixth Amendment fair cross-section analysis].)

■ I am satisfied that the District Attorney, as the representative of the entire community, has standing to contest a defendant's discriminatory exercise of peremptory challenges, since, to use the language of the Supreme Court in exercising its supervisory powers in a case involving the systematic exclusion of women from jury service, "[t]he injury [from discrimination] is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts" *(Ballard v United States,* 329 US 187, 195 [1946]). Or, as Judge Kramer put it in *Gary M.,* "[t]he State as representative of the community has standing to complain about an injury to the community, to the jury

system and to the law as an institution." (138 Misc 2d, *supra,* at 1091.) *Gary M.* also concluded that the District Attorney, as a representative of the State, could act as an agent for the excluded jurors, who were State citizens. Finally, *Gary M.* reasoned that the District Attorney had standing to assert the claims of the excluded jurors under the theory of third-party standing. I find all of these arguments to be persuasive and conclude that the People established the first element of their prima facie case.

### 2. *Other relevant facts and circumstances*

In determining whether the People have established a prima facie case, I must also consider facts and all other relevant circumstances sufficient to raise an inference of purposeful discrimination. In *Batson (supra),* the court explained that examples of such relevant circumstances include: (1) a "pattern" of challenges to jurors of a particular race; and (2) the questions asked and statements made during voir dire and in the exercise of the challenges. (476 US, *supra,* at 96-97; *People v Scott,* 70 NY2d, *supra,* at 423.)

■ In this case, the relevant facts and circumstances clearly establish a prima facie case of purposeful discrimination. The People first identified a discriminatory pattern in the defense exercise of peremptory challenges; the defense used those challenges to exclude all eight white prospective jurors who had not been excused for cause. Furthermore, defense counsel's own statements and past conduct indicate that it was their objective to obtain a nonwhite jury.

During the extensive proceedings involving the issue of whether a prima facie showing was made, counsel repeatedly expressed their preference for nonwhite jurors, in terms that, in isolation from all other circumstances, suggested all they were trying to do was to carefully scrutinize the prospective white jurors, since as they argued "it is extremely difficult for white jurors—not all—but for many or maybe most to judge fairly in a case where nine white police—to [sic] have been attempted to be murdered and six seriously wounded by a black defendant." Unquestionably, given the history of race relations in this country, a black defendant must be able to consider the racial composition of a jury or as the defense put it, just before giving explanations for each challenge: "How can we not consider the question of race? These are white policemen. This is a black, young black man in 1988, are we to deny the history of his people in this country". However, these

expressions of what appears to be legitimate concern were belied by the past conduct of the defense and other explicit statements, which made it certain that it was the defense objective to obtain a nonwhite jury, not just to be especially careful in the selection process with regard to white jurors.

Received into evidence without objection was a video tape recording of a television interview in which one of the defense attorneys stated "I'd like a Third World jury—that's a jury of his peers." Later, during the same interview when asked whether whites are biased but blacks are not, the attorney responded, "No, well whites, yes". It is evident that the attorney was making explicit his true objective: the selection of an entirely nonwhite jury. Defense counsel also called this a racially charged case because it involved a black defendant accused of the attempted murder of white police officers. But, since the alleged victims included two Hispanic officers, and not "nine white police officers" as stated by counsel, this misstatement confirms the conclusion that the jury selection was proceeding on racially impermissible grounds. In addition, the statement also makes it evident that defense counsel had improperly assumed that white jurors, simply because of their race, would be partial to the white victims.

Furthermore, the past conduct of the same defense attorneys, in a prior case involving this defendant, which I have considered, supports rather than rebuts this conclusion. Defense counsel argued that their conduct, before me, at that earlier trial just before the instant case, when the defendant was charged with, and acquitted of, charges relating to a quadruple homicide of four Hispanic alleged drug dealers, established that they were not biased against whites because in that case they had selected three white jurors. While whites were selected as jurors in that trial, all four victims were Hispanic and defense counsel peremptorily challenged every prospective Hispanic juror until they had exhausted their peremptories. Indeed, at that trial, defense counsel explained their challenges to these prospective Hispanic jurors as follows: "The Hispanics are excluded, the ones so far, because the victims are Hispanic. I think that's an arguable reason; four victims, four Hispanic victims. * * * [W]e were excluding her because she was Dominican. And I think the four persons who were killed were Dominicans and I think that's a valid cognizable right to exclude." Therefore, contrary to their claim of nonracially motivated exercise of peremptory challenges, the prior conduct of counsel, involving this defen-

dant, established a trial strategy of excluding from jury service persons of the same ethnicity as the victims, *solely* because of that shared ethnicity.

I concluded, therefore, that defense counsel's prior statements and conduct, as well as the discriminatory pattern of their peremptory challenges in this case, raised an inference of purposeful discrimination in the exercise of their peremptory challenges. Consequently, I held that the People established a prima facie case of such discrimination.

### B. *The Batson inquiry*

Once the People made this prima facie showing of purposeful discrimination in the defense exercise of peremptory challenges, the burden shifted to the defense to rebut the inference of discrimination by articulating nonpretextual, racially neutral explanations for the peremptory challenges. I heard these explanations, over the People's objection, both in camera and ex parte. For the following reasons, in at least three instances, I concluded that the proffered racially neutral reasons were merely pretextual and that the defense improperly excused these white jurors solely because of their race.

### 1. *Procedure*

Before turning to the explanations themselves, it is necessary to explain my decision to hear the explanations both in camera and ex parte. The People argued that this ex parte procedure unfairly prevented them from responding to the specific explanations offered by the defense. While I recognize that ex parte procedures are the disfavored exception to the general rule of adversarial proceedings *(United States v Bagley,* 473 US 667, 675 [1985]; *United States v Thompson,* 827 F2d 1254, 1257 [9th Cir 1987]), I note that *Batson v Kentucky* (476 US 79, 99-100, n 24, *supra)* expressly refrained from formulating procedures to implement its holding, and at least one Federal appellate court has held that the *Batson* inquiry may be made ex parte. *(United States v Davis,* 809 F2d 1194, 1200-1202 [6th Cir 1987], *cert denied* 483 US 1008, [1987]; *see also, State v Jackson,* 322 NC 251, 368 SE2d 838 [1988] [defendant has no right to examine prosecutor on *Batson*-required explanations of peremptory challenges].) Moreover, the one Federal Circuit holding that a prosecutor could not give *Batson* explanations ex parte did so because, in its view, the defendant's constitutional right to due process required that he be present. *(United States v Thompson,* 827

F2d, *supra,* at 1257-1258.) There was no suggestion that that court would require the presence of the prosecutor when explanations are ordered from the defense. Furthermore, an ex parte proceeding may be necessary to protect the defendant's Sixth Amendment right to effective assistance of counsel. Otherwise, in offering their explanations for peremptorily challenged jurors, defense counsel might be required to expose their legitimate jury selection strategies to the People. And, in so doing, in an appropriate case, this could provide the prosecution with an unfair advantage. Since it was not possible to determine in advance if this would have occurred, I took the defense explanations of their peremptory challenges ex parte and in camera. Now that jury selection has long been completed, and since the explanations offered do not reveal a jury selection strategy and since they also expressly did not reveal any privileged attorney-client communications, there is now no impediment to unsealing and discussing the proffered explanations.

## 2. *Evaluation of the Defense Explanations—Factors to Consider*

■ According to *Batson (supra),* a prima facie showing of purposeful discrimination in the exercise of peremptory challenges may be rebutted only by "a neutral explanation related to the particular case to be tried." (476 US, *supra,* at 98.) While this explanation need not rise to the level of a cause challenge, it must be " 'clear and reasonably specific' " and explain the " 'legitimate reasons' " for the peremptory challenges. *(Supra,* at 98, n 20.) Thus, the court concluded that a prosecutor who exercised peremptory challenges to exclude blacks from the jury "may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race * * *. Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or "affirm[ing] [his] good faith in * * * individual selections". (476 US, *supra,* at 97-98.) Furthermore, the court recognized that this procedure required the trial court to act in a fact-finding capacity by assessing the credibility of the attorneys advancing the purportedly racially neutral explanations.

Thus, courts applying *Batson (supra)* have held that a prima facie showing of purposeful discrimination in the exercise of

peremptory challenges is not rebutted by a mere statement of a racially neutral reason for the challenges. *(Ward v State,* 293 Ark 88, 733 SW2d 728 [1987]; *Chew v State,* 71 Md App 681, 527 A2d 369 [1987].)* Instead, as the California Supreme Court wrote, the Trial Judge must conduct a searching inquiry in "[a] sincere and reasoned attempt to evaluate the * * * explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [attorney] has examined members of the venire and has exercised challenges for cause or peremptorily" *(People v Hall,* 35 Cal 3d 161, 167-168, 672 P2d 854, 858 [1983]; *see also, State v Butler,* 731 SW2d 265 [Mo App 1987]). In addition to the Trial Judge's own background and observations, various courts that have considered this issue have discussed other factors to be considered, which include: (1) the "racial context" of the case, i.e., whether there is any perceived advantage to excluding a particular race from the jury *(State v Antwine,* 743 SW2d 51, 67 [Mo 1987], *cert denied* — US —, 108 S Ct 1755 [1988]; *United States v Mathews,* 803 F2d 325, 332 [7th Cir 1986]); (2) a past pattern of discriminatory practices by the attorney *(United States v Mathews,* 803 F2d, *supra,* at 332); (3) whether the stated explanation is an assumption about a particular group that does not apply to the particular juror challenged *(Slappy v State,* 503 So 2d 350, 355 [Fla App, 3d Dist 1987], *cert denied* — US —, 108 S Ct 2873 [1988]); (4) whether other similarly situated jurors were also challenged *(People v Bridget,* 139 AD2d 587 [2d Dept 1988]; *People v Gregory ZZ.,* 134 AD2d 814, 816 [3d Dept 1987], *lv denied* 71 NY2d 905 [1988]; *State v Tolliver,* 750 SW2d 624 [Mo App 1988]; *State v Antwine,* 743 SW2d, *supra,* at 67; *Slappy v State,* 503 So 2d, *supra,* at 355; *State v Butler,* 731 SW2d, *supra,* at 271); (5) disparate questioning of challenged and unchallenged jurors *(Slappy v State,* 503 So 2d, *supra,* at 355; *McCormick v State,* 184 Ga App 687, 362 SE2d 472, 474 [1986]); (6) whether the challenged jurors were questioned on voir dire about the purported reason for the challenge *(State v Butler,* 731 SW2d, *supra,* at 272; *Slappy v State,* 503 So 2d, *supra,* at 355; *Ward v State,* 293 Ark 88, 733 SW2d 728, 730, *supra);* and (7) counsel's own statements of a preference for jurors of a particular race *(Clark v City of Bridgeport,* 645 F Supp 890, 898 [D Conn 1986]; *see generally,* Pizzi, *Batson v. Kentucky: Curing The Disease But Killing The Patient,* 1987 Sup Ct Rev 97 [1987] [for an excellent treatment of the problems involved in the application of *Batson]).*

### 3. *Explanations Proffered*

In this case, after the issue of the racial composition of the jury had been argued extensively, defense counsel offered explanations of their peremptory challenges of white jurors, but first made a preliminary statement, which consisted, in part, of the following: "[T]here can be no question that in a case that is racially charged such as this, that we do consider race as one of the factors in considering a jury and what we are basically looking for, when we consider a white juror, is those factors which would either tell us affirmatively that this is a person that can be fair in a racially charged situation or for those factors which speak to us of how this person would have difficulty hearing this despite whatever reassurances they may make on the record as well as those factors in their private lives and their past which speaks to us of an impossibility of fairness, or if not impossibility, which may be too strong a word, a problem with being fair to Larry Davis in this case."

While counsel sought to establish by this statement that their goal was the legitimate one of sensitivity to racial differences between the defendant, and the prospective white jurors, it became evident from the explanations given that, in fact, several such jurors were excused for grounds that were solely racially motivated; such as one who was excused because he was a "white-dominating male" or another who was excused because he was "born in County Corke *[sic]*, Ireland".

In this connection, the defense conduct during jury selection is worthy of note. Each prospective jury was given a detailed nine-page questionnaire, prepared almost entirely by the defense. There was not a single question in this questionnaire which related—directly or indirectly—to race, or racial attitudes. Moreover, during the actual voir dire, 7 of the 8 peremptorily challenged white prospective jurors were not asked a single question about their racial attitudes. Only prospective juror No. 11247 was asked such a question, which concerned the race of teen-agers who she said had "mugged" her husband.

Turning to the actual explanations: According to defense counsel, juror No. 11306 was excused primarily because he was Irish and might identify with four victims who had Irish surnames. Counsel stated: "Our main quarrel with [juror No. 11306] was that first of all he spoke with an Irish accent, he was born in County Corke *[sic]*, Ireland [and] testifying will be

persons that were injured or threatened with injury in this case are Police Officer Buckley, O'Sullivan, McCarren and O'Hara. We felt that there could well be an ethnic prejudice that would be felt whether or not he could deal with it at the proper time was questionable." Although counsel voiced concern about a possible "ethnic prejudice," they did not ask juror No. 11306 a single question which would permit a determination whether such prejudice existed. Consequently, they could have had no reason, other than the fact of juror No. 11306's ethnicity, to believe that he harbored any such prejudice.

In addition to the ethnicity of juror No. 11306, defense counsel also offered other reasons to explain their peremptory challenge of him. I found, however, each of these additional reasons to be pretextual. First, defense counsel stated that juror No. 11306 resided in Riverdale, which they argued was a high-income and therefore *"de facto* segregated" neighborhood. In giving the same reason to explain their challenge to another white juror, defense counsel asserted that Riverdale is a "[w]hite neighborhood of very upper income persons unlike the defendant and also a place that is *de facto* segregated." Defense counsel made this assertion even though no questions asked on voir dire established that Riverdale was either predominantly upper income or predominantly white. However, even assuming this bald assertion to be true, it is not a proper reason for excluding juror No. 11306. And there is no evidence that juror No. 11306 is "unlike the defendant" because he is of an "upper income" class; in fact, his completed questionnaire indicates his occupation as a "handyman" and therefore he is certainly unlikely to be a person of "very upper income". In reality, it is clear that in the absence of any questioning to ascertain the juror's racial attitudes, he was rejected because of his race.

Defense counsel also claimed that they disbelieved juror No. 11306's stated lack of knowledge about the case because his questionnaire indicated that he watched television news programs on channels 2, 4 and 5. Specifically, juror No. 11306 stated that while he had read the newspapers or watched news on television about the case at the time of the alleged incidents, which were approximately 18 months earlier, he could not remember any of the details of anything that he had heard. I find this explanation to be pretextual since defense counsel found credible and accepted minority jurors with similar media exposure who also stated that they knew little

or nothing about the case. Defense counsel accepted these jurors: (1) juror No. 8085, who read the Daily News more than four times per week and who watched channel 7 news whenever possible, and yet stated that he had heard about the case only at the time of the incident but could no longer remember the details; (2) juror No. 11344, who read the Daily News and watched television news at 11:00 P.M. daily, and yet said that he had never heard of the case; (3) juror No. 10595 who read the Daily News more than four times per week as well as the Sunday New York Times, and said that he had read that the defendant had been apprehended after a long pursuit, but that he could not remember the details; and (4) juror No. 10210, who read both the New York Post and the Daily News 2 to 3 times per week and who watched NBC news twice a week, stated that he had heard about the case at the time of the incident, but gave no details of his recollection, and was never asked to do so by defense counsel. Therefore, because of this disparate treatment of minority and white prospective jurors, I also reject this defense explanation as illegitimate.

Finally, when asked by the court if there was "anything further," defense counsel added that juror No. 11306 had been excused because he "had been a victim of several crimes of mugging and robbery." I believe this reason, too, to be pretextual. This juror's questionnaire indicates only that either he or a friend or relative was a victim of a mugging and robbery. Defense counsel never questioned juror No. 11306 about this response, and it was the court's questioning that revealed that the juror's home had been burglarized and that he or someone he knew had been the victim of a mugging. Moreover, defense counsel selected as jurors two individuals who had also been crime victims: juror No. 10322 had been mugged and had her car vandalized; and juror No. 10595's car had been burglarized. Consequently, I do not believe that juror No. 11306 was excused because he, and a person he knew, had been crime victims. Instead, after considering these explanations in light of the prior statements and past conduct of defense counsel, this white prospective juror was improperly excused solely on the basis of his race.

Nor do I accept the explanations offered to explain the defense challenge to juror No. 8463. Defense counsel explained that this white woman was peremptorily challenged for the following reasons: (1) the juror had personal experience with the police as they came to her home when her brother-in-law died there and she was satisfied with their response; (2) as

with juror No. 11306, defense counsel disbelieved juror No. 8463's stated lack of knowledge about the case as her questionnaire indicated that she read the Daily News more than four times per week and watched channel 7 news; (3) this case, which involves an alleged shootout and charges of attempted murder, would be "too rough" for this juror who was "a maiden lady who's living alone"; and (4) the juror's answers to voir dire questions were given in a monosyllabic tone and with her head hanging down. Each of these reasons, after considering them in light of defense counsel's prior statements and conduct as well as the manner in which they were offered, I concluded were pretextual. Defense counsel conceded, when the explanation was offered, that this prospective juror's one experience with the police, if taken alone, did not merit a challenge. In fact, jurors selected by the defense also had experiences with the police; for example, juror No. 11166 had actually called the police several times in connection with her position as a subway token clerk. Additionally the record of the voir dire indicates that minority jurors were questioned differently on this issue. Defense counsel elicited this information from juror No. 8463 by asking her about her questionnaire response indicating that she had witnessed a police response to an emergency. However, defense counsel did not question three of the persons selected as jurors who gave the same response on their questionnaires. Consequently, I do not believe that juror No. 8463's one experience with the police in any way influenced the defense decision to challenge her. Nor do I accept the other reasons proffered by defense counsel for the excuse of juror No. 8463. As with juror No. 11306, the disparate treatment of white and minority prospective jurors belies defense counsel's contention that juror No. 8463 was challenged primarily because they did not believe her stated lack of knowledge about the case. As previously discussed, defense counsel found credible and accepted minority jurors with similar media exposure who also said that they knew nothing or little about the case. Finally, I do not accept as legitimate the explanation that juror No. 8463 was excused because she was emotional or answered questions in a monosyllabic tone. Examination of the transcript shows that her answers were consistent with the questions asked and while she may have spoken in a low voice, there was no basis to conclude that she was "emotional", whatever that meant. Therefore, given the stated objective of defense counsel to obtain a "Third World," or nonwhite jury and, as I have found

each of the proffered reasons for the defense challenge of juror No. 8463 to be pretextual, I conclude that this white prospective juror was also improperly excluded solely because of her race.

Finally, I also reject the explanations offered by the defense for their excuse of juror No. 10146. According to defense counsel, this prospective juror, a white male, was peremptorily challenged for the following reasons: (1) he was "a white dominating male" who appeared nervous and hostile to defense counsel, and did not make eye contact with defense counsel; (2) he had served on two prior State criminal juries, once as the foreperson; (3) he had been a victim of a car theft; (4) over 20 years ago he had served in the military as an M.P.; and (5) as with juror No. 11306 and juror No. 8463, defense counsel disbelieved juror No. 10146's stated inability to recall the details of what he had heard about the case since he carried and read the New York Post daily. Again in light of defense counsel's past statements and prior conduct, I found each of these reasons to be pretextual.

The first proffered reason, that juror No. 10146 was "a dominating white male," needs no elaboration. It makes it clear that the challenge was for racial reasons. Thus, I reject as illegitimate defense counsel's statements that juror No. 10146 was challenged because he appeared nervous or hostile and did not make eye contact with defense counsel. Moreover, I do not believe that this juror was challenged because of his prior jury service or even because he had once served as a foreperson. In fact, 6 out of the 8 minority jurors selected by defense counsel had previously served on criminal and civil juries. Nor do I believe that this juror was excused because he was the victim of a car theft; as I noted earlier, defense counsel accepted minority jurors who had been crime victims. Since defense counsel accepted juror No. 10210, a person who had been a member of the Air Force Police, I also reject the defense statement that juror No. 10146 was excused because of his military service as an M.P. 20 years ago. Finally, because of the disparate treatment of minority and white jurors who stated that they knew little or nothing about the case despite their media exposure, I do not believe that this juror was excused for that reason.

Therefore, since I found all the proffered explanations for the defense challenge to juror No. 10146 to be pretextual, I concluded that this juror, like jurors Nos. 11306 and 8463, was

challenged solely because of his race, in violation of both Federal and State law.

## C. *The Remedy*

The Supreme Court, in *Batson v Kentucky* (476 US 79, 99-100, n 24, *supra*), expressly declined to instruct trial courts on the appropriate remedy to redress the unconstitutional excuse of jurors, peremptorily challenged solely because of their race, noting: "In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case * * * or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire". Instead, the court left the decision to the trial courts.

The People have asked for the two remedies mentioned by the Supreme Court: that the excused white jurors be reseated if the defense could not provide legitimate racially neutral explanations for the challenges to them; or in the alternative, the discharge of the entire venire and commencement of jury selection anew. Defense counsel, at oral argument, suggested a third alternative, which was employed in *People v Kern* (NYLJ, Sept. 22, 1987, at 3, col 3 [Sup Ct, Queens County, Demakos, J.], *writ of prohibition dismissed sub nom. Matter of Landone v Demakos,* 133 AD2d 435 [2d Dept], *lv denied* 70 NY2d 607 [1987], *mot for stay of execution of sentence granted* 137 AD2d 862 [2d Dept 1988]). According to defense counsel, the six jurors sworn at the time of the *Batson* motion would remain on the jury, but, the defense would be required to satisfactorily explain any future peremptory challenges of white prospective jurors. After considering each of these options, I concluded that the discharge of the entire venire was the only appropriate remedy.

In this case, the People made their *Batson* motion after two complete rounds of jury selection which resulted in the selection and swearing of six jurors. Additionally, two jurors had been selected in a third round, although they were not yet sworn at the time of the motion and the third panel had not yet been excused. At this point, it would have been impossible

to reseat the improperly challenged jurors. Seven of the eight challenged prospective jurors already had been excused and discharged from jury service. Furthermore, those excused jurors were likely to have heard about the reason they were excused and then reseated, since it was recognized by all the parties that the *Batson* motion had received enormous publicity.

Nor do I consider appropriate defendant's alternative of keeping the six sworn jurors and requiring explanations as to any future peremptory challenge of white prospective jurors. I found that, during the selection resulting in those first six jurors, white prospective jurors were unconstitutionally challenged and excused. Consequently, the People were unfairly denied the opportunity to select those prospective jurors and this lost opportunity would not be redressed by simply requiring explanations in the future. While it may be that the People could have made the *Batson* motion earlier, they cannot be faulted for waiting until the discriminatory exercise of peremptory challenges by counsel became overwhelmingly obvious. Therefore, the only appropriate remedy was the discharge of the entire venire and commencement of a new jury selection during which the defense would be required to provide nonpretextual racially neutral reasons for the peremptory challenges of white prospective jurors.

### III. THE CONTINUED APPLICATION OF *BATSON* THROUGHOUT SUBSEQUENT JURY SELECTIONS

During the second jury selection, which commenced after the discharge of the first venire and the six sworn jurors, I required defense counsel to explain, in camera and ex parte, the peremptory challenge of white prospective jurors. Since I found these explanations to be both nonpretextual and racially neutral it was not necessary to seat any of the challenged jurors over defense objection.[3] Moreover, during this

---

3. I accepted as nonpretextual and racially neutral each of the explanations offered by the defense for their peremptory challenges of white prospective jurors during the "second" and "third" jury selections. These explanations were accepted because I concluded, after considering both the explanations themselves, as well as the manner in which they were given, that these explanations were not solely racially motivated.

Before the *Batson* motion was made, defense counsel exercised their peremptory challenges to obtain their stated objective of a "Third World" or nonwhite jury. When defense counsel was subsequently required to provide racially neutral explanations for the suspect challenges, they did so cavali-

second jury selection, the defense did not exercise peremptory challenges as to two white jurors,[4] who were both later excused for cause. While defense counsel consented to the excuse of the first juror for reasons of economic hardship, they opposed the People's motion to excuse the second juror, a man who expressed concern about his wife's fears that he might be harassed by the police because of his service as a juror in this case. When the People's motion to excuse the juror was granted, defendant moved for what was described as a "mistrial," although the relief requested was actually the discharge of the entire venire, as, at the request of the defense,[5] none of the 12 selected jurors had yet been sworn. The People disputed defendant's ground for the motion, but consented to the requested "mistrial". Consequently, I discharged the entire venire, including the selected but unsworn jurors, and commenced jury selection for a third time.

At this point, the defendant moved to be relieved from my prior *Batson* ruling that the defense provide nonpretextual,

---

erly, and it was clear to me that the reasons for at least some of the suspect challenges were manufactured to satisfy *Batson v Kentucky* (476 US 79). After I discharged the first venire, however, the conduct of defense counsel changed both in their voir dire and in offering the *Batson* explanations. During the second and third jury selections, an additional questionnaire, designed to determine racial attitudes, was prepared and completed by each prospective juror. In addition, I permitted a searching voir dire on racial attitudes to enable counsel to ascertain whether prospective jurors harbored any racial bias against the defendant. Additionally, the demeanor of the defense attorneys in offering the explanations also changed. The process was treated more seriously and, I believed, based on my observations both of the attorney and the prospective jurors, that the racially neutral reasons given for the suspect challenges in the second and third jury selections were legitimate. Some of these proffered reasons related to the potential racial bias of the challenged jurors, as revealed during voir dire, while other reasons related to other matters entirely. While defense counsel, who proffered several reasons to explain each suspect peremptory challenge, sometimes proffered, in addition to legitimate reasons, an improper racially motivated reason (for example, that the challenged juror "lived in Riverdale"), I concluded that none of the white prospective jurors excused during the second and third jury selections was the subject of a solely racially motivated challenge.

4. Defense counsel also opposed the People's cause challenge to a third white juror. However, the defense never had an opportunity to select this juror, as the People challenged her peremptorily after their cause application was denied.

5. When I announced my decision to discharge the six sworn jurors, defense counsel requested that any subsequently selected juror not be sworn until they had exhausted State appellate review and Federal habeas review. I granted this request. However, as noted in footnote 1 *(supra),* defendant's efforts were unsuccessful.

racially neutral explanations for their peremptory challenges of white prospective jurors. Defendant claimed that this relief was appropriate for the following reasons: (1) during the second jury selection, the defense satisfactorily explained their peremptory challenges of white jurors; (2) the declaration of a "mistrial" terminated the previous trial and initiated a new, distinct trial, to which prior trial rulings do not apply; (3) the People made the initial *Batson* motion in bad faith and, therefore, my ruling on the motion should no longer apply to the defense; and (4) my initial *Batson* ruling resulted in widespread negative publicity about both defense counsel and the defendant, and many prospective jurors were aware of that publicity. The People responded that the *Batson* ruling is the law of the case and should, therefore, continue to apply to the defense throughout subsequent jury selections.

The third and fourth grounds for relief hardly merit discussion. I reject the claim that the People acted in bad faith by moving to prohibit the defendant from exercising peremptory challenges which were solely racially motivated. There is no evidence that the People acted in bad faith; instead, the facts indicate that their motion was prompted by the apparently discriminatory practices of defense counsel, which I found established a prima facie case of purposeful discrimination. Nor is the alleged adverse publicity, generated from my *Batson* ruling, a basis to relieve the defense of their burden to rebut that prima facie showing of discrimination. Consequently, I reject that claim as well.

Defendant's first two asserted grounds for relief are also without merit. Contrary to his claim, defendant is not relieved of the burden to satisfactorily explain his future peremptory challenges to white prospective jurors simply because he has adequately explained past challenges in the same case. Pursuant to *Batson v Kentucky* (476 US 79) a prima facie case of purposeful discrimination is rebutted by a statement of the legitimate, racially neutral reasons for the suspect peremptory challenges. There is no suggestion that this prima facie showing evaporates once satisfactory explanations are offered for suspect peremptory challenges exercised following the *Batson* ruling. To hold in this fashion would turn the *Batson* ruling on its head since an acceptable explanation would lead to no further explanation, and then the process would have to start all over again. Thus, a prima facie showing of purposeful discrimination imposes a continuing obligation to satisfactorily explain future, as well as past challenges to members of

the victimized racial group, in the case in which the ruling was made. Here, then, the prima facie showing of purposeful discrimination obligated the defense to explain all of its peremptory challenges of white prospective jurors until the completion of jury selection.

Finally, the argument that the discharge of the second group of selected jurors was a "mistrial" and, therefore, that the *Batson* ruling no longer applies to the subsequent "new trial" is baseless. There has been no mistrial in this case as the discharged jurors, at the request of the defense, had not yet been sworn. Instead, the relief granted was the discharge of the entire venire, including the selected jurors, and commencement of a jury selection for a third time. This discharge then did not relieve the defense of its burden under *Batson (supra)* to satisfactorily explain its peremptory challenges of white prospective jurors. Even, however, had a mistrial been granted, that is that sworn jurors had been discharged, I believe, for similar reasons that no party should be able to escape the burden of *Batson,* once a prima facie showing has been made, simply by moving for a mistrial and arguing that the subsequent selection now entitles him to a fresh start. Thus, the *Batson* ruling remained extant throughout the trial.