OPINION OF THE COURT
Alexander, J.
 On this appeal, defendants assert a right, through the *643 mechanism of the peremptory challenge, to exclude persons of a particular race from service on a criminal jury. We hold today that such racial discrimination has no place in our courtrooms and that such conduct by defense counsel is prohibited by both the Civil Rights Clause and the Equal Protection Clause of our State Constitution. Accordingly, we affirm the order of the Appellate Division upholding defendants’ convictions.
I
Defendants were convicted, after a highly publicized trial, of manslaughter, and other charges arising out of their participation in an attack by a group of white teen-agers upon three black men in the community of Howard Beach in Queens. This so-called "Howard Beach incident” occurred during the early morning hours of December 20, 1986, after the three victims, Michael Griffith, Cedric Sandiford and Timothy Grimes left their disabled car on the nearby Cross Bay Boulevard and walked into the Howard Beach neighborhood to seek assistance.
At the same time that Griffith, Sandiford and Grimes left their car, a birthday party was being held in Howard Beach and was attended by approximately 30 teen-agers, including defendants Kern, Lester, and Ladone, their codefendant Michael Pirone[1] and the accomplice who testified against them, Robert Riley. At approximately 12:20 a.m., Kern’s girlfriend, Claudia Calogero, left the party and was driven home by Salvatore DeSimone, accompanied by Lester and a fourth youth. As DeSimone turned the corner from Cross Bay Boulevard onto 157th Avenue, Griffith, Grimes and Sandiford started to cross the street, heading towards the New Park Pizzeria. Calogero testified that three black men darted in front of the car, forcing DeSimone to stop suddenly. An argument ensued between the pedestrians and the occupants of the car. According to Calogero, Sandiford stuck his head into the car window and stared at the teen-agers. According to Sandiford’s testimony, however, the occupants of the car stuck their heads out of the window and yelled "Niggers, get [out of] the neighborhood”. Following that confrontation, the three men crossed the street and entered the pizzeria while the *644 youths continued on their way. After driving Calogero home, DeSimone, Lester and the other youth returned to the party.
Robert Riley was sitting on the steps outside the house where the party was being held when DeSimone, Lester and the other youth arrived. Lester shouted "There were some niggers on the boulevard, lets go up there and kill them”. A few minutes later, a number of youths, including Kern, Lester, Ladone and Pirone, left the party to track down the three black men. DeSimone led the caravan of cars from the party to the New Park Pizzeria in his car with Lester and Ladone. Riley followed in his own car with three male teen-agers and Laura Castagna, whom Riley intended to escort home. John Saggese followed the group in his car. Although Riley did not know in which car Kern and Pirone traveled, he testified that he observed the two when the group eventually arrived at the pizzeria.
Meanwhile, at approximately 12:45 a.m., Grimes, Sandiford and Griffith left the New Park Pizzeria. At that point, the cars containing the teen-agers pulled into the parking lot and the youths, with the exception of Laura Castagna, emerged from the cars. The group, wielding bats and sticks, confronted Griffith, Grimes and Sandiford and yelled at them to get out of the neighborhood. Riley testified that Kern was banging a baseball bat on the ground as the teen-agers formed a semicircle around the three men, who, according to Riley, were each holding a knife. According to Grimes, several of the youths were carrying bats and sticks and one youth held "something that looked like an iron pipe”. Sandiford testified that he did not have a weapon and that he did not observe whether Griffith or Grimes displayed any weapons. Grimes testified that he pulled out a knife and held it in front of him as the youths approached. At that point, Sandiford was struck in the back by a bat. Although Riley never saw Kern swing the bat he had been holding, he did testify that after Sandiford was struck, Riley grabbed the bat from Kern because he (Riley) could swing it "harder”. As the three men fled across Cross Bay Boulevard, Riley, Kern, Ladone, Lester, Pirone and several other youths gave chase.
Griffith, Grimes and Sandiford ran in different directions. Grimes headed north on Cross Bay Boulevard and managed to escape his attackers. Sandiford was struck several times with bats and tree limbs as his assailants chanted "Niggers, get * * * out of the neighborhood”. Sandiford was able to break *645 away from the youths and was eventually joined by Griffith as they ran down an alleyway behind several stores parallel to Cross Bay Boulevard. The two men were followed by Kern, Ladone, Lester, Riley, Pirone and two other youths. The alleyway ended at a three-foot-high barricade where it intersected with 156th Avenue. Both Sandiford and Griffith jumped over the barricade and made a left turn onto 156th Avenue. The group of teen-agers followed, approximately 30 feet behind, jumped the barricade and continued the chase.
At that time, Saggese pulled up in the westbound lane on 156th Avenue, and, after clearing the barricade, Riley got into the backseat. The car followed closely behind the youths on foot, who turned right on 90th Street, following Griffith. At the end of 90th Street, a three-foot-high guardrail separated that street from the Belt Parkway, a six-lane highway which runs east and west. Shore Parkway, a service road for the Belt Parkway which also runs east and west, partially intersects 90th Street at the guardrail and leads to Cross Bay Boulevard. The Saggese car, which had pulled ahead of the youths on foot, “ stopped three quarters of the way down 90th Street. Lester ran to the car, grabbed a bat from Riley, and he, Riley, Kern and Ladone ran toward the end of 90th Street after Griffith. Griffith jumped over the guardrail and ran onto the Belt Parkway. When the youths reached the guardrail, Riley observed Griffith run across the three eastbound lanes of the highway, jump the center median and enter the westbound lanes where he was struck by a car driven by Dominic Blum. Griffith was killed in the accident; his body was thrown a distance of approximately 75 to 125 feet and Blum left the scene without realizing that he had hit a person. He later returned to the scene of the accident and spoke to the police.
After the youths observed Griffith being struck by a car, Lester, Kern and Ladone ran back toward 156th Avenue where they met up with two other youths. Riley, Pirone, Saggese and another youth returned in Saggese’s car to the pizzeria, where they picked up Castagna and headed toward 156th Avenue.
Sandiford, who had managed to temporarily escape his assailants, was walking west on 156th Avenue when he was attacked from behind by the group of teen-agers who beat him with bats and tree limbs. Sandiford testified that he managed to grab the bat being wielded by Lester as he pleaded with Lester not to kill him. At that point, a car pulled up and, as *646 its occupants approached, Sandiford released the bat which Lester then swung at him, striking him in the head and causing blood to run down the back of his head. He further testified that he "fe[lt] like [his] brain * * * busted apart”.
Sandiford broke away from his attackers, who continued to chase him. The chase ended when Sandiford tried to climb a chainlink fence which ran parallel to the Belt Parkway. The youths pulled Sandiford down from the fence, kicking and beating him with bats and tree limbs. Sandiford cried for help to Theresa Fisher, who was standing in the doorway of a house across the street. In response, Fisher called the police. A tape recording of her 911 call was admitted into evidence at the trial. The beating of Sandiford continued and the final attack was witnessed by George and Marie Toscano, who also called the police.
After his assailants left him, Sandiford was picked up by a police car on the Belt Parkway and driven to the site where Griffith’s body was located, where he identified the body. He was later taken to the hospital and treated for his injuries.
Thereafter, defendants were arrested and indicted and Huntley hearings were conducted on the admissibility of their statements to law enforcement officials. The hearing on Lester’s statements established that he was arrested and brought to the 106th Precinct on the the morning of December 22, 1986. When Lester requested and was given a newspaper by a police officer, Lester read the front-page headline about the Howard Beach incident and declared "[t]his isn’t what happened. It’s not even close.” Lester was then advised, for the first time, of his Miranda rights and gave a statement detailing his participation in the crime. Questioning ceased at 1:50 p.m., when Lester was advised that his attorney had telephoned. Shortly before 2:00 p.m., Lester was seated uncuffed in a room adjoining the squad room. Lester motioned to Assistant District Attorney Wolk, who was standing in the squad room. Wolk recounted his conversation with Lester as follows: "[Lester] said to me, '[a]re you an attorney?’ I said '[j]ust so you know, I’m an Assistant District Attorney’. After I said that [Lester] motioned me towards him with a finger. I walked a few steps towards him and I stood next to him. [Lester] said * * * T know people are giving me up. I won’t give anybody up. I was taught you don’t rat on your friends, but I’ll tell you what I did.’ I stood there and he continued * * * T chased the taller black guy with a baseball bat and I struck him with the *647 baseball bat, but I didn’t chase the other guy.’ Then he repeated again, T won’t tell you what anybody else did. I was taught you don’t rat on your friends’ ”. Following this conversation, Wolk walked away from Lester. Supreme Court ruled admissible Lester’s declaration upon viewing the newspaper and his statement to ADA Wolk. The court also ruled admissible certain statements made by defendants Kern and Ladone.
After these rulings, the trial commenced. On the first day of jury selection, defense counsel successfully challenged for cause one of the four black jurors on the panel. Defense counsel unsuccessfully challenged for cause two of the remaining three black jurors, and subsequently peremptorily challenged all three black jurors. Before exercising these peremptories, defense counsel applied for eight additional peremptory challenges because, in their view, the black jurors did not "want to be excused. They’re coming in here, volunteering”, whereas white jurors "who aren’t anxious to serve are using all kinds of excuses to get off any duty”. Supreme Court rejected defense counsel’s argument that the venire did not represent a fair cross-section of the community and denied the application. After the defense exercised its peremptory challenges, the prosecution argued that it had established a prima facie case of discrimination and moved to require defense counsel to provide racially neutral explanations for the challenges to black prospective jurors. Supreme Court denied the application as premature.
The prosecution renewed its application on the third day of jury selection and the court reserved decision. At the end of voir dire that day, defense counsel challenged for cause six black jurors on the panel. One challenge was granted on consent and the remainder were denied. The next day, Supreme Court ruled that defense counsel could not constitutionally exercise peremptory challenges in a racially discriminatory manner and held that the procedures articulated in Batson v Kentucky (476 US 79) were therefore applicable to defense counsel. As a remedy, the court ordered that its ruling be applied prospectively — requiring defense counsel to provide neutral explanations for any future peremptory challenges of black jurors.
When jury selection resumed, the defense peremptorily challenged seven black jurors. One juror was excused without explanation and the defense proffered racially neutral explanations for the challenges to the remaining six. The court *648 accepted the explanations as to three of the jurors, and rejected the explanations offered as to the other three jurors. Two of those jurors, however, were subsequently excused for unrelated reasons and only one juror was seated over defense objection. That juror, however, was also excused when her son became ill prior to the completion of the trial. The first alternate, who had been accepted by both the prosecution and the defense, took her place and deliberated with the other jurors, all of whom the defense had indicated were satisfactory.
Defendants Kern and Lester were convicted of second degree manslaughter with regard to Griffith’s death, first degree assault with regard to the attack on Sandiford at 156th Avenue, and fifth degree conspiracy. Ladone was convicted of second degree manslaughter and first degree assault. The Appellate Division affirmed their convictions in all respects and defendants appeal by leave of an Associate Judge of this court.
Defendants’ primary contention on this appeal is that Supreme Court erred in restricting their exercise of peremptory challenges. They argue that neither the State nor the Federal Constitutions prohibit a criminal defendant from exercising racially discriminatory peremptory challenges. In addition, they argue that the evidence was legally insufficient to sustain their convictions and that Supreme Court committed reversible error by admitting certain of their statements at the trial. We find the arguments unpersuasive and affirm the order of the Appellate Division.
II
Although peremptory challenges have long played an important role in the conduct of criminal trials (Holland v Illinois, 493 US —, 110 S Ct 803; Lewis v United States, 146 US 370, 380; Pointer v United States, 151 US 396, 408-409; see also, People v Thompson, 79 AD2d 87; see generally, Goldwasser, Limiting a Criminal Defendant’s Use of Peremptory Challenges: On Symmetry and the Jury in a Criminal Trial, 102 Harv L Rev 808), they are not of constitutional dimension (Holland v Illinois, supra; Batson v Kentucky, 476 US, at 91, supra; Stilson v United States, 250 US 583, 586; Hayes v Missouri, 120 US 68, 71-72; People v Lobel, 298 NY 243, 257; People v Doran, 246 NY 409, 426-427; Walter v People, 32 NY 147, 160). In New York, it was not until 1828 that defendants *649 were accorded the right to exercise peremptory challenges (2 Rev Stat of NY [1829], part IV, ch II, tit V, § 9; see, People v Thompson, 79 AD2d, at 98, supra). Today, the right derives from CPL 270.25, which defines a peremptory challenge as "an objection to a prospective juror for which no reason need be assigned” and sets the number of peremptory challenges for both the prosecution and the defense in accordance with the seriousness of the crimes charged.
The prosecution’s exercise of peremptory challenges, however, is not completely unfettered. The Supreme Court has restricted the prosecution’s use of peremptories in accordance with the mandates of the Equal Protection Clause, holding that the Fourteenth Amendment prohibits the prosecution from exercising peremptory challenges so as to purposefully exclude persons of a particular race from service on the petit jury (Batson v Kentucky, 476 US 79, supra; Swain v Alabama, 380 US 202; Strauder v West Virginia, 100 US 303). Of course, at least to the extent that our State equal protection provision is coextensive with the Federal provision (Matter of Esler v Walters, 56 NY2d 306, 314), the State Constitution prohibits such discrimination as well (see, People v Hernandez, 75 NY2d 350; cf., People v McCray, 57 NY2d 542, 550, cert denied 461 US 961 [following Swain]). Rejecting the evidentiary standard articulated in Swain v Alabama (supra), Batson established the present procedure for making out an equal protection claim in the selection of the petit jury. First, the defendant is required to establish a prima facie case of discrimination by demonstrating that (1) he or she is a member of a cognizable racial group, (2) the prosecution has exercised peremptory challenges to exclude members of that group from the petit jury, and (3) "these facts and any other relevant circumstances raise an inference” of purposeful discrimination (Batson v Kentucky, 476 US, at 96, supra; see also, People v Jenkins, 75 NY2d 550 [decided today]; People v Scott, 70 NY2d 420). Once the defendant has made such a showing, the burden shifts to the prosecution to articulate nonpretextual, racially neutral reasons for the suspect peremptory challenges (Batson v Kentucky, 476 US, at 97, supra).
The question we confront today is whether the procedures articulated in Batson may be applied to limit the exercise of peremptory challenges by the defense. Since defense peremptory challenges are not so limited by statute, the question, more precisely, is whether purposeful racial discrimination by defendants and their counsel, in the form of exercising pe *650 remptory challenges to exclude a particular racial group from the petit jury, is constitutionally permissible. For the reasons that follow, we agree with the courts below that such purposeful racial discrimination is prohibited by both the Civil Rights Clause and the Equal Protection Clause of article I, § 11 of our State Constitution.
A
As a threshold matter, we reject the People’s contention that defendants’ challenge to the restrictions on their peremptory challenges is moot because the one juror seated over their objection was excused prior to deliberations. Supreme Court’s ruling, after six jurors had been selected, that the Batson procedures would be applied to the defense, affected the selection of all the remaining jurors. Once the People established a prima facie case of discrimination, defense counsel were required to offer nonpretextual, racially neutral explanations for their peremptory challenges to black prospective jurors. The legitimacy of the reasons proffered, defense counsel knew, might be evaluated in light of their conduct throughout the jury selection, including their questioning of and challenges to white prospective jurors (see, e.g., People v Bridget, 139 AD2d 587, 588; People v Gregory ZZ., 134 AD2d 814, 816, lv denied 71 NY2d 905; State v Tolliver, 750 SW2d 624 [Mo App 1988]; State v Antwine, 743 SW2d 51 [Mo 1987]; Slappy v State, 503 So 2d 350 [Fla App, 3d Dist 1987], cert denied 487 US 1219). Consequently, the defense questioning of these white prospective jurors, some of whom did serve on the jury, may have been inhibited as well.
B
Because this case implicates fundamental policies of the State of New York, we turn to the question of whether the State Constitution permits the purposeful racial discrimination practiced by the defense here. We conclude that it does not.
Section 11 of article I of the State Constitution provides: "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.” While the first sentence of this *651 section is an equal protection provision which, like the Federal equal protection right, is addressed to "State action” (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 360, n 6; Matter of Esler v Walters, 56 NY2d 306, 314, supra; Dorsey v Stuyvesant Town Corp., 299 NY 512, 530-531), the Civil Rights Clause contained in the second sentence prohibits private as well as State discrimination as to "civil rights” (Dorsey v Stuyvesant Town Corp., 299 NY, at 531, supra). The term "civil rights” was understood by the delegates at the 1938 Constitutional Convention to mean "those rights which appertain to a person by virtue of his citizenship in a state or community” (4 Rev Record of NY State Constitutional Convention, 1938, at 2626 [statement of Delegate H.E. Lewis]). The Civil Rights Clause is not self-executing, however, and prohibits discrimination only as to civil rights which are "elsewhere declared” by Constitution, statute, or common law (id., at 2626-2627; see also, Dorsey v Stuyvesant Town Corp., 299 NY, at 531, supra).
Defendants argue that this Civil Rights Clause is inapplicable in this instance because no statute prohibits the exercise of racially discriminatory peremptory challenges. This argument, however, reduces our constitutional Civil Rights Clause to a mere redundancy; in defendants’ view, the clause would operate to prohibit private discrimination only where such discrimination was already expressly prohibited by statute. We do not read the constitutional provision so narrowly.
In Dorsey, we held that the right to be free from racial discrimination in the acquisition of housing was not a "civil right” "elsewhere declared” because, at that time, no statute recognized the right to the acquisition of an interest in real property to be a civil right, the delegates at the Constitutional Convention in 1938 had expressly rejected the designation of such an interest as a civil right, and the Legislature had recently declined to amend the Civil Rights Law to define the opportunity to purchase and lease real property to be a civil right (Dorsey v Stuyvesant Town Corp., 299 NY, at 531, supra).
Jury service, by contrast, is a civil right established by Constitution and statute. First, jury service is a "privilege[] of citizenship” secured to the citizens of this State by article I, § 1 of the State Constitution. Service on the jury has long been recognized to be both a privilege and duty of citizenship (Thiel v Southern Pac. Co., 328 US 217, 224; Strauder v West Virginia, 100 US, at 308, supra; see also, People v Briggins, 67 *652 AD2d 1004, 1006 [Titone, J., dissenting], revd 50 NY2d 302; People v Gary M., 138 Misc 2d 1081, 1095; People v Davis, 142 Misc 2d 881, 889). Indeed, it is because jury service is a means of participation in government that, in the words of Mr. Justice Black, "[i]t is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government” (Smith v Texas, 311 US 128, 130).
These concerns have been articulated in the context of ensuring that a criminal defendant is tried by a jury drawn from a venire that is representative of a fair cross section of the community (see, Taylor v Louisiana, 419 US 522) and that the Grand Jury, the venire and the petit jury afford him the equal protection of the laws (Smith v Texas, supra; Strauder v West Virginia, supra; Batson v Kentucky, supra). Nevertheless, these cases illustrate that jury service is a means of participation in government which can only be considered a privilege of citizenship. Racial discrimination in the selection of juries harms the excluded juror by denying this opportunity to participate in the administration of justice, and it harms society by impairing the integrity of the criminal trial process (Batson v Kentucky, 476 US, at 87-88, supra; McCray v Abrams, 461 US 961, 968 [Marshall, J., dissenting from denial of certiorari]; Ballard v United States, 329 US 187, 195).
We reject defendants’ contention that these fundamental concerns are relevant only to prohibiting racial discrimination in the selection of the venire and therefore that the privilege of citizenship secured by article I, § 1 extends only to qualification for jury service on the venire. A citizen’s privilege to be free of racial discrimination in the qualification for jury service is hardly a privilege if that individual may nevertheless be kept from service on the petit jury solely because of race. While it is true that no citizen has a right to sit on any particular petit jury, the Legislature has declared as the policy of this State that "all eligible citizens shall have the opportunity [and obligation] to serve on grand and petit juries in this state” (Judiciary Law § 500). We hold today that this opportunity for service on a petit jury is a privilege of citizenship which may not be denied our citizens solely on the basis of their race.
*653 Second, the Legislature has expressly declared service on the petit jury to be a civil right, providing in Civil Rights Law § 13 that "[n]o citizen of the state possessing all other qualifications which are or may be required or prescribed by law, shall be disqualified to serve as a * * * petit juror in any court of this state on account of race”. We are unpersuaded by defendants’ contention that this statute is directed only at the actions of the Jury Commissioner and does not serve to limit the peremptories accorded to the defense in CPL 270.25. The statute leaves no doubt that service on the petit jury is a civil right in this State, and, this being so, it is the Civil Rights Clause of article I, § 11 of the Constitution which limits the defense exercise of its peremptories, notwithstanding the language of CPL 270.25.
Accordingly, we conclude that purposeful racial discrimination in the exercise of peremptory challenges, whether exercised by the prosecution or the defense, is prohibited by the Civil Rights Clause of article I, § 11 of the State Constitution.[2]
C
The People further argue that the exercise of racially discriminatory peremptory challenges by the defense violates article I, § 11 because such challenges deny the excused jurors the equal protection of the laws. In previous cases we have held that our State equal protection provision, like the Federal equal protection right, is directed at discrimination attributed to the government and requires a showing of "State action” (Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d, at 360, n 6, supra; Matter of Esler v Walters, 56 NY2d, at 314, supra; Dorsey v Stuyvesant Town Corp., 299 NY, at 530-531, supra).
Our analysis begins with the Supreme Court’s decision in Batson v Kentucky (supra). In Batson, the court expressly declined to decide whether the Equal Protection Clause restricted the exercise of peremptory challenges by defense counsel as well as the prosecution (Batson v Kentucky, 476 US, at 89, n 12, supra), although in his dissent, Chief Justice *654 Burger concluded that the same restrictions on defense peremptories would "inevitably” follow (id., at 125-126) and Justice Marshall, concurring in the majority opinion, noted that the "potential for racial prejudice * * * inheres in the defendant’s challenge as well” and recommended eliminating peremptories entirely (id., at 108). Moreover, while holding that the Equal Protection Clause prohibits a prosecutor’s exercise of peremptory challenges to exclude from the petit jury a member of the defendant’s race, the court recognized that it was both the defendant and the excluded juror who were denied equal protection (Batson v Kentucky, 476 US, at 87-88, supra; see also, Strauder v West Virginia, 100 US, at 308, supra). In addition, the court’s decision to prohibit racial discrimination in the exercise of prosecution peremptories was also premised upon the injury to the criminal justice system inherent in such discrimination: "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others’ ” (Batson v Kentucky, 476 US, at 87-88, supra [citations omitted]). By their application to restrict defense peremptory challenges, the People have asserted the rights both of the excluded jurors and the community-at-large.[3]
*655 Defendants argue that Batson does not restrict their exercise of peremptory challenges because such conduct is not State action and therefore is not subject to the mandates of the Equal Protection Clause. The People respond that the defense exercise of racially discriminatory peremptory challenges is sufficiently imbued with the authority of the State to constitute "State action” for the purposes of equal protection.
While it is settled that the Equal Protection Clause of the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful” (Shelley v Kraemer, 334 US 1, 13; Civil Rights Cases, 109 US 3), there is no precise formula to determine State responsibility under the clause. It is "[o]nly by sifting facts and weighing circumstances [that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance” (Burton v Wilmington Parking Auth., 365 US 715, 722). More recently, the court explained that the requisite State action is present when "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State” (Lugar v Edmondson Oil Co., 457 US 922, 937).
Defendants, relying on Polk County v Dodson (454 US 312), argue that the defense exercise of peremptory challenges is not State action because the decision to discriminate is purely private, and therefore not attributable to the State. In Polk, the court held that a public defender’s withdrawal of an appeal was not action "under color of state law” for the purposes of 42 USC § 1983, reasoning that although the public defender was a State employee, he performed an essentially private function (454 US, at 318-319, supra). Contrary to defendants’ contention, we do not read Polk as establishing that every action performed by a defense attorney may never be attributable to the State. The argument before the court in Polk was that the actions of the public defender were necessarily attributable to the State by virtue of the attorney’s relationship to the State and not because of any action taken by the State. Indeed, the court later likened the claim in Polk to an argument that the State was responsible for the private decisions of a nursing home because the State extensively regulated the nursing home industry (Blum v Yaretsky, 457 *656 US 991, 1008-1009). It is in that circumstance, where there is no other action by the State affecting the discriminatory act, that the relevant inquiry is whether the decision to discriminate can be attributed to the State (id., at 1004; Jackson v Metropolitan Edison Co., 419 US 345, 357; Moose Lodge No. 107 v Irvis, 407 US 163; Flagg Bros, v Brooks, 436 US 149, 166; see also, Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, supra).
To be distinguished are circumstances such, as that presented here — where the claimed State action arises from the State enforcement of and involvement in the discriminatory act. Thus in Shelley v Kraemer (334 US 1, supra), the court held that judicial enforcement of racially restrictive covenants constituted State action, notwithstanding that the decision to discriminate could not be ascribed to the State. Rather, State action existed because "the States have made available to [persons choosing to discriminate] the full coercive power of government to deny [black citizens] the enjoyment of property rights” (id., at 19; see also, Matter of Wilson, 59 NY2d 461, 478). Similarly, in Lugar v Edmondson Oil Co. (457 US 922, supra), the court found State action where a private party made use of ex parte State attachment procedures to deprive another person of his property. The court explained that the State had created the attachment right and that the private party’s joint participation with State officials in the seizure of the property was sufficient to render that person a "State actor”, even though the decision to seize the property was purely private (id., at 941; compare, Adickes v Kress & Co., 398 US 144; see also, Tulsa Professional Collection Seros, v Pope, 485 US 478, 484-488). The question is whether the degree of involvement by the State can be said to be substantial such that the coercive power of the State has been enlisted to enforce private discrimination (Tulsa Professional Collection Servs. v Pope, supra; Shelley v Kraemer, supra; Matter of Wilson, 59 NY2d, at 479, supra).
Turning then to the case before us, there can be no question that the State is inevitably and inextricably involved in the process of excluding jurors as a result of a defendant’s peremptory challenges. A defendant’s right to exercise the challenges is conferred by State statute (CPL 270.25). The jurors are summoned for jury service by the State (see, Judiciary Law § 516), sit in a public courtroom and are subject to voir dire at the direction of the State, and, although defense counsel exercises the peremptory challenge and advises the *657 Judge of the decision, it is the Judge, with the full coercive authority of the State, who enforces the discriminatory decision by ordering the excused juror to leave the courtroom escorted by uniformed court officers or Deputy Sheriffs. The jurors do not know whether it is the Judge, the prosecutor or the defense attorney who has excused them, and the inference is inescapable to both the excluded jurors and the public that it is the State that has ordered the jurors to leave. When these jurors are so excluded solely because of their race, the State cannot ignore its role in the discrimination against them. We fully agree with the sentiments expressed by a panel of the Fifth Circuit in a different context but apt language: "Justice would indeed be blind if it failed to recognize that the [trial] court is employed as a vehicle for racial discrimination when peremptory challenges are used to exclude jurors because of their race. The government is inevitably and inextricably involved as an actor in the process by which a [trial] judge, robed in black, seated in a paneled courtroom, in front of an American flag, says to a juror, 'Ms. X, you are excused’. A litigant’s decision to provoke the court’s action by virtue of a statutorily accorded right does not disguise the official governmental character of the procedure as a whole.” (Edmonson v Leesville Concrete Co., 860 F2d 1308, 1313, on reh 895 F2d 218.)
Thus we agree with the courts below that the judicial enforcement of racially discriminatory peremptory challenges exercised by defense counsel constitutes "State action” for the purposes of our State equal protection provision and therefore that Batson applies to the defense (see, People v Gary M., 138 Misc 2d 1081, supra; People v Muriale, 138 Misc 2d 1056; People v Davis, 142 Misc 2d 881, supra; People v Piermont, 143 Misc 2d 839; see also, Chew v State, 71 Md App 681, 527 A2d 332; State v Alvarado, 221 NJ Super 324, 534 A2d 440; Maloney v Washington, 690 F Supp 687; Note, Discrimination by the Defense: Peremptory Challenges After Batson v Kentucky, 88 Colum L Rev 355 [1988]; cf., Fludd v Dykes, 863 F2d 822 [11th Cir] [holding Batson applicable to civil trials]; Esposito v Buonome, 642 F Supp 760 [same]; Thomas v Diversified Contrs., 551 So 2d 343 [Ala] [same]; Chavous v Brown, 299 SC 398, 385 SE2d 206 [same]; but see, Edmonson v Leesville Concrete Co., 895 F2d 218 [5th Cir] [en banc], supra [Batson inapplicable to civil trials]).
Accordingly, we conclude that upon the People’s demonstration of a prima facie case of discrimination, Supreme Court *658 properly required defense counsel to provide nonpretextual, racially neutral explanations for their challenges to black jurors. Thus, when defense counsel failed to explain their peremptory challenge to one juror, she was properly seated over their objection.
Ill
 We also reject defendants’ contentions that the evidence adduced at trial was legally insufficient to support their convictions of second degree manslaughter (Penal Law § 125.15 [1]) and first degree assault (Penal Law § 120.10 [1]).
Viewed in the light most favorable to the People (People v Contes, 60 NY2d 620, 621), the evidence supports the jury’s finding that defendants recklessly caused Griffith’s death (Penal Law § 125.15 [1]) because they were aware of the risk of death to Griffith as they continued to chase him on 90th Street and onto a six-lane highway, they consciously disregarded that risk, and, in so doing, grossly deviated from the standard of care which reasonable persons would have observed under the circumstances (see, Penal Law § 15.05 [3]). The evidence was also sufficient to support findings that defendants’ actions were a "sufficiently direct cause” of Griffith’s death (People v Kibbe, 35 NY2d 407, 413) and that although it was possible for Griffith to escape his attackers by turning onto Shore Road rather than attempting to cross the Belt Parkway, it was foreseeable and indeed probable that Griffith would choose the escape route most likely to dissuade his attackers from pursuit. The evidence was sufficient to prove, beyond a reasonable doubt, that Blum’s operation of his automobile on the Belt Parkway was not an intervening cause sufficient to relieve defendants of criminal liability for the directly foreseeable consequences of their actions (id., at 413).
The evidence is also legally sufficient to support defendants’ conviction of first degree assault (Penal Law § 120.10 [1]). Contrary to defendants’ contention, when viewed in the light most favorable to the People (People v Contes, 60 NY2d, at 621, supra), the evidence supports the jury’s determination that Sandiford suffered "serious physical injury” as a result of their attack upon him. Their determination that Sandiford suffered a "protracted impairment of [his] health” (Penal Law § 10.00 [10]) was supported by the testimony of Sandiford and the doctors who treated him that Sandiford suffered severe injuries to his back and right eye which affected him for nearly a year after the incident.
*659 Defendants also assign error to several of Supreme Court’s suppression and trial rulings. We note that any error in the admission of Lester’s statement to Assistant District Attorney Wolk (see, People v Cunningham, 49 NY2d 203), is harmless beyond a reasonable doubt. The content of the statement, in which Lester admitted hitting Sandiford in the head with a bat, was also established by Sandiford’s own testimony, as corroborated by the testimony of Robert Riley and three nonaccomplice eyewitnesses. Thus, in light of the overwhelming evidence of defendants’ guilt, there is no reasonable possibility that the statement contributed to the verdict (People v Crimmins, 36 NY2d 230, 237). We have reviewed those of defendants’ remaining contentions which have been preserved for our review, and conclude that they do not warrant reversal.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Wachtler and Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed.

. Pirone, who was tried jointly with the other defendants, was acquitted of all the charges against him.

. We note that our decision is in accord with the decisions of several other State courts which, interpreting their own Constitutions, have held that defendants, as well as the prosecution, are prohibited from exercising racially discriminatory peremptory challenges (see, Commonwealth v Soares, 377 Mass 461, 387 NE2d 499, cert denied, 444 US 881; People v Wheeler, 22 Cal 3d 258, 583 P2d 748; State v Neil, 457 So 2d 481 [Fla]).

. We also reject defendants’ contention that Batson is inapplicable to the defense because the District Attorney is not a member of a cognizable racial group and therefore does not have standing to assert the equal protection rights of the excluded jurors (see, Batson v Kentucky, 476 US 79, 96; Castaneda v Partida, 430 US 482). Although a plurality of the Supreme Court has recently declined to pass on the issue (Holland v Illinois, 493 US —, 110 S Ct 803), five Justices agreed that notwithstanding the "cognizable racial group” requirement articulated in Batson, a criminal defendant’s race is "irrelevant to the Fourteenth Amendment standing inquiry”, concluding that a white defendant would have standing to challenge the exclusion of blacks from his petit jury (id., at —, at 814 [Marshall, J., dissenting]; id., at —, at 811-812 [Kennedy, J., concurring]; id., at —, at 820-822 [Stevens, J., dissenting]). We agree with the Appellate Division that as a representative of the community, the District Attorney has a direct interest in protecting its citizens and therefore a substantial relationship with the excluded jurors (149 AD2d, at 233). Moreover, as the jurors are not parties to the litigation and are unlikely to be able to assert their own rights, the State should be able to vindicate their rights (id.; see, Holland v Illinois, 493 US, at —, 110 S *655 Ct, at 811-812 [Kennedy, J., concurring]). For these reasons, we conclude that the District Attorney has standing to assert the rights of these jurors under both the Equal Protection Clause and the Civil Rights Clause of our State Constitution.