OPINION OF THE COURT
David Goldstein, J.
ISSUES
The novel issues concern the procedure to be followed during jury selection, where a Batson (Batson v Kentucky, 476 US 79) or Kern (People v Kern, 75 NY2d 638, cert denied 498 US 824) challenge is made and it appears that there may be a developing discriminatory pattern, particularly where no race-neutral, nonpretextual reason is given. In other words, should prospective jurors, who may have been the subject of discrimination, be retained during future rounds, separate from sworn jurors, in the event their services are needed as a result of what appears to be a developing pattern of discrimination? A further issue relates to the appropriate remedial action to be taken when, on subsequent rounds, the existence of discrimination becomes clear, i.e., where a Kern challenge is sustained, in what order are such jurors to be seated, especially where those discriminated against in earlier rounds have been retained and the composition of the jury, without the effects of the discrimination, may be recreated?
Two rounds of jury selection are at issue here, as a result of which there developed a clear pattern of discrimination by defendant, directed against whites.
FACTS
(a) Jury Selection — Round 1
In round 1, the People exercised three peremptory challenges directed against an African-American, Caucasian and Hispanic. Defendant then challenged all four of the remaining whites, which resulted in the selection of four jurors, a gentleman of Indian extraction, an Asian and two African-Americans.
*271 At this point, the District Attorney raised a Batson-Kem objection. Giving defendant the benefit of any doubt, the court found no pattern of discrimination at that time. Nevertheless, it did afford defense counsel an opportunity, if he wished, to set forth, on the record, his reasons for excusing those jurors. In this way, the basis for his action could be preserved while the jurors were still present. Although he did not have to do so, counsel voluntarily set forth his reasons. As to two of the four jurors, the reasons were wholly inconsistent with the facts, sufficient to conclude that the reason, although, on the surface, race-neutral, could be a pretext, possibly designed to mask a discriminatory motive.
As to juror No. 8, counsel stated he did not like his response to the question as to burden of proof and the presumption of innocence. However, juror No. 8 had actually given the correct answer, that, if he had to vote before having heard any proof, he would vote "not guilty” as a result of the presumption and the failure of the People to satisfy their burden. In fact, counsel used this answer to inquire of the others who had responded incorrectly. No other reason or basis was proffered.
As to juror No. 12, it was argued that she had witnessed a homicide and, therefore, she was unacceptable. However, at no time did the juror state that she had witnessed a homicide; rather, she said she heard about one in her neighborhood— that she saw two men crossing the street and, later the same day, heard about a homicide and assumed it was the same two men. The examination clearly established her desire to serve, which was not shaken by proding or counsel’s suggestion that he knew juror No. 12’s boss and that she probably knew him (defense counsel) as well. She was emphatic that she did not. Although she initially sought to be excused, this related to the time away from her job as a real estate broker.
As to the remaining jurors, No. 14 was excused and No. 13, who was Caucasian, was seated as juror No. 5. At that time, defense counsel proclaimed in substance that, since he had now chosen a white, there could be no Kern challenge in subsequent rounds. The court disagreed, observing that the selection of what might appear to be a token representative, standing alone, would not automatically obviate a reverse Batson or Kern challenge (see, People v Jenkins, 75 NY2d 550, 557; People v Childress, 81 NY2d 263). The propriety of any such challenge would depend upon events as they developed in the course of jury selection.
*272 In terms of any discrimination, the court found insufficient proof to sustain a clear discriminatory pattern at this stage, albeit counsel’s conduct was suspicious. The Kern challenge was reasserted by the District Attorney, but was denied. Inasmuch as the grounds offered with respect to Nos. 8 and 12 were pretextual, no reason was given for the peremptory challenges. Nevertheless, as a safeguard against what appeared to be a possible emerging pattern of discrimination, Nos. 8 and 12 were directed to remain in the rear of the courtroom, separate from the balance of the panel and from the five sworn jurors. This assured their presence in the event, in future rounds, it became clear that defense counsel was improperly discriminating against Caucasians.
In doing so, the court advised that it would not hesitate to seat those jurors (Nos. 8 and 12) if what was suspicious, in terms of discrimination, in the first round became evident in future rounds. In fact, counsel was cautioned several times before proceeding with voir dire in the second round, that there could be a need for affirmative action here since, in the second round, there were 12 whites and only 2 blacks on the panel.
(b) Jury Selection — Round 2
In the second round, defendant challenged Nos. 6 and 7 for cause, which was denied. Mr. Cronley (No. 6) had an infant at home and claimed he helped his wife by caring for the child during the early morning feeding. Since he worked at night, when his wife was home to care for the child, there was no basis to excuse him. His situation was no different than that of any other married juror with a young child, whose spouse could care for the infant. The challenge to Mr. Hartenstein (No. 7) related to his health and his prior bypass surgery. However, he stated this would not interfere with his serving as a juror. During voir dire, neither attorney asked any questions as to his health.
After defendant peremptorily challenged Nos. 6 and 7, the District Attorney renewed her reverse Batson or Kern challenge, which was denied as premature, once again, the court concluding that the additional challenges did not establish a pattern of discrimination so as to require defendant to set forth his reasons, especially in view of the selection of three white jurors, namely, Nos. 1, 2 and 4 in the second round. As it did in the first round, the court permitted defense counsel to set forth the basis for his challenges, which he declined to do.
*273 Jury selection then continued, eight jurors having been agreed to by both sides, albeit this was not yet announced. Defendant challenged both Caucasian jurors, Nos. 8 and 10, retaining Nos. 9 and 11, both of whom were African-Americans. In doing so, defense counsel, in Freudian fashion, jumped the gun in announcing that he was challenging Nos. 8, 10 and 12, although, at that time, the parties had not yet considered juror No. 12. The fact that and manner by which this was done is an additional factor to reflect counsel’s apparent goal of removing as many Caucasians as he could.
Upon renewal of the People’s Kern challenge, the court found a sufficient pattern of discrimination, aimed at the exclusion of whites, so as to require defense counsel to set forth, on the record, race-neutral reasons for his peremptory challenges. The reasons given as to Nos. 6 and 7 were the same as those advanced on the challenge for cause, namely, that Cronley would rather be home with his infant to care for the child at night, and Hartenstein had bypass surgery at one time, although we don’t know when, and he himself stated that this would not interfere with his service as a juror. As to No. 8, counsel stated that he had prior jury service in a Federal case and, it was claimed, the difference in procedure between the two systems would make him unacceptable as a juror in a State trial.
Although the reasons appeared to be pretextual, giving defense counsel the benefit of any doubt, the court proceeded with the selection of the remaining two jurors, both of whom were white. Defendant challenged both peremptorily, whereupon the prosecutrix renewed her Kern challenge, pointing to what clearly appeared as a pattern of deliberate exclusion of whites through both rounds of jury selection.
Defendant’s challenge to No. 12 was based upon the disclosure that she had been the victim of a crime, which, according to defense counsel, was a violent crime, a mugging. To the contrary, the court had inquired of Ms. Adler whether the "mugging” involved actual physical injury or was a pocketbook snatch. Her response was that no injury was sustained. Inasmuch as defendant did not apply the same standard to other prospective jurors who were black, permitting on the jury African-Americans who had been victims of a crime, or whose relatives had been victims of a crime, it was concluded that the reason given to reject No. 12 was a mere pretext, with a clear purpose to conceal an improper discriminatory intent.
*274 As to No. 13, defense counsel expressed the view that the juror felt somewhat apprehensive around guns, didn’t like guns and would not like to touch or handle one. While this would not disqualify her from service, counsel expressed a desire not to have on the jury a person with those general feelings, dislikes or fears. Notwithstanding that he did not similarly inquire as to this subject with any other prospective juror, on either round and, although a gun was never recovered in this case, the court did give defendant the benefit of the doubt in terms of the reason given for No. 13. Nevertheless, considering the manner by which the selection process was conducted, it is fairly clear that the primary goal was to eliminate Caucasians from the panel, albeit the underlying reason for this is not apparent.
RULING ON KERN CHALLENGE
Taking into account the totality of the circumstances, it is patent that what defendant did here was to latch onto one fact as to each excluded juror which he claimed was critical and conclusive in terms of disqualification, but which was not explored in voir dire with other prospective jurors. Plainly, this served an over-all scheme to eliminate as many Caucasian jurors as possible. All 10 of his peremptory challenges were directed against Caucasians.
As a result, the court disallowed the challenge to Nos. 8 and 12 in round 1 and No. 12 in round 2 (since no race-neutral reason had been given, the court having found the reasons advanced to be pretextual) and, over defendant’s objection, seated all three, respectively, as sworn jurors and first alternate. Inasmuch as none of the challenges were disclosed in open court, the jury was reconstructed as it would have been had there been no discrimination, requiring that one sworn juror be moved from No. 5 to No. 7 and another be seated as the first alternate.
In sustaining the Kern challenge, this court, in conservative fashion, gave defendant the benefit of the doubt with respect to many of the "race-neutral” reasons given by counsel. Thus, it permitted the exclusion of No. 6 (Cronley), No. 7 (Hartenstein), No. 8 (Glass) and No. 13 (Aliberti), peremptorily, although the excuse offered as to each was, at the very least, suspicious and, under all the circumstances, pretextual.
The reason given as to Cronley is palpably insufficient and could be applied to similarly exclude any working parent with *275 a newborn child, notwithstanding that the other spouse is available to care for the child. Equally absurd is that ascribed to Glass (his prior service on a Federal jury, which, according to defendant, would preclude him from serving as a juror in a State case). As to Hartenstein, while one could take the position that, possibly, a person with a prior heart condition should not serve as a juror in a murder case, there were no questions directed to him or to any other juror dealing with health or medical condition. Similarly, although the apprehension expressed by Aliberti with respect to guns could be viewed as a factor to be considered, the matter was not explored with any other juror in either round.
All of this compels the conclusion that the reasons were pretextual, designed to conceal defendant’s primary aim to eliminate Caucasians from the jury, albeit the underlying rationale is not at all clear, particularly in view of the fact that the crime itself contained no racial overtones. The absence of a racially related motive, however, is not dispositive. Rather, what is critical in terms of the operative legal standard, and clearly appears on this record, is that, in the selection of the jury, defense counsel improperly sought to exclude Caucasians from jury service, action violative of the constitutional rights of such prospective jurors. In my view, sufficient was shown to mandate remedial action by this court.
LAW

Reverse-Batson or Kern Challenge

In Batson v Kentucky (476 US 79, supra) the United States Supreme Court held that a prosecutor’s use of peremptory challenges to exclude prospective jurors, solely on account of race, amounted to a violation of defendant’s right to equal protection under the 14th Amendment. In doing so, the Court took cognizance of a defendant’s right "to be tried by a jury whose members are selected pursuant to non-discriminatory criteria” (supra, at 85-86). In terms of procedure, it cautioned trial courts to consider "all relevant circumstances” (supra, at 96-97) in determining whether there has been purposeful discrimination, and observed (supra, at 97): "a 'pattern’ of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor’s questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.”
*276 And, once a prima facie showing has been made, the burden shifts to the prosecutor to come forward with a race-neutral reason for the challenge, which explanation "need not rise to the level justifying exercise of a challenge for cause” (supra), may not be a race-related reason, nor may he merely deny a discriminatory motive or claim, in general fashion, that selections were made in good faith.
In People v Kern (75 NY2d 638, supra) our Court of Appeals held the Batson rule equally applicable to defense counsel, recognizing that a Batson type violation ran afoul of both the Federal and State Constitutions. Thus, it held that the Civil Rights and Equal Protection Clauses of the New York Constitution (art I, § 11) prohibited racial discrimination by defendant’s attorney in the selection of a jury. In terms of procedure, the Court of Appeals observed (75 NY2d, at 650): "Once the People established a prima facie case of discrimination, defense counsel were required to offer nonpretextual, racially neutral explanations for their peremptory challenges to black prospective jurors” (emphasis added).
Concluding that jury service was a constitutionally protected civil right, secured to all citizens by article I, § 1 of the NY Constitution, the Court in Kern (supra) took cognizance of the fact that purposeful racial discrimination, by either the prosecution or the defense, impinges upon the rights accorded to prospective jurors and amounts to a denial of equal protection: "Racial discrimination in the selection of juries harms the excluded juror by denying this opportunity to participate in the administration of justice, and it harms society by impairing the integrity of the criminal trial process [citing cases] * * * While it is true that no citizen has a right to sit on any particular petit jury, the Legislature has declared as the policy of this State that 'all eligible citizens shall have the opportunity [and obligation] to serve on grand and petit juries in this state’ (Judiciary Law § 500). We hold today that this opportunity for service on a petit jury is a privilege of citizenship which may not be denied our citizens solely on the basis of their race.” (Supra, at 652.)
To the same effect is People v Jenkins (75 NY2d 550, supra), decided the same day as Kern (supra), wherein the Court, recognizing that discrimination "undermines public confidence in the fairness of our system of justice * * * and is repugnant to the just operation of a free society” (75 NY2d, at 558), held: "The exercise of peremptory challenges against prospective jurors solely because of race discriminates unconstitutionally *277 against the excluded juror * * * [citing cases]. Jury duty is an important privilege and obligation of citizenship that should not be denied to some citizens simply because of their race.” (Supra, at 557.)
It has been held that a Batson or Kern claim may be made at any time, as peremptory challenges are exercised, regardless whether jury selection has been completed (People v Bolling, 79 NY2d 317, 321; People v Green, 181 AD2d 693, lv denied 79 NY2d 1049). Once such a claim is interposed, it must be determined whether a prima facie showing of discriminatory use of peremptory challenges has been made, which may be shown by facts and circumstances to support "an inference of impermissible discrimination.” (People v Childress, supra, 81 NY2d, at 266.)
As was recognized in People v Bolling (supra, at 323-324), while "[t]here are no fixed rules for determining what evidence will give rise to an inference sufficient to establish a prima facie case of discrimination * * * a pattern of strikes or questions and statements made * * * during voir dire suggesting discriminatory motives” is sufficient (People v Bolling, supra, at 323-324; see also, People v Childress, supra, at 266-267; People v Jenkins, supra). Such a showing may also be made by establishing that members of a particular racial group were excluded, while others with the same relevant characteristics were not, or by objective facts to reflect that counsel has challenged members of a group who, as a result of their individual backgrounds, would be expected to be favorably disposed toward his client (People v Childress, supra; People v Bolling, supra; People v Scott, 70 NY2d 420, 425; People v Brown, 193 AD2d 611).
And, contrary to defense counsel’s suggestion during jury selection in this case, the mere inclusion of members of the challenged racial or ethnic group will not defeat an otherwise valid Batson or Kern motion (People v Childress, supra, at 267; People v Bolling, supra, at 324). As the Court of Appeals observed in People v Childress (supra, at 267), "the exclusion of even one member of a group for racial reasons is abhorrent to a fair system of justice.”
As noted, once a prima facie showing has been made of a discriminatory exercise of peremptory challenges, the burden shifts to the opposing party "to come forward with nonpretextual race-neutral explanations” for their challenges (People v Jenkins, supra, at 556; People v Kern, supra, at 657-658; People v Hernandez, 75 NY2d 350, 356).
*278 In the present case, it clearly appears that, at the least, there was an inference of discrimination in terms of defense counsel’s exercise of peremptory challenges, both as a result of the manner by which the voir dire was conducted and the pattern of strikes over the first two rounds. The factual basis for this conclusion has been reviewed at length, earlier in this opinion. What clearly appears from the jury selection process was an evolving pattern of discrimination, with defense counsel adhering to an underlying trial strategy, for whatever reason, to eliminate Caucasians from jury service. In an effort to accomplish that aim, he exercised all 10 of his peremptory challenges in the deliberate exclusion of whites from the panel, plainly, his primary goal in selecting a jury in this case.
As noted, when confronted, he gave, as justification, reasons which appear on their face to be legitimate race-neutral explanations, but, actually amount to mere pretexts, designed to shield or mask the underlying strategy to remove whites from the panel. Plainly, this was an illegal and improper infringement upon the constitutional rights of such persons, depriving them of their right to partake in jury service.
In a given case, whether the reason offered is real or only a pretext, designed to shield a discriminatory plan, is a matter addressed to the sound discretion of the trial court (see, People v Hernandez, supra, 75 NY2d, at 356). In Hernandez, the prosecutor presented "a legitimate neutral ground for exercising a peremptory challenge”. Nevertheless, the Court held (supra, at 356): "it was for the trial court to determine if the prosecutor’s explanation was pretextual or real and justified by the answers and conduct of the two jurors during voir dire.”
In our case, as noted, the court extended to defendant every benefit of the doubt concerning the explanations for the exercise of his peremptory challenges, namely, in the second round, No. 6 (Cronley), No. 7 (Hartenstein), No. 8 (Glass) and No. 13 (Aliberti). The most glaring is Mr. Glass, whose disqualifying feature was stated to be his prior service on a Federal jury, and Mr. Cronley, who preferred to be at home with his infant child for the 2:00 a.m. feeding. While these appear to be contrived as grounds for disqualification, were the court to have disallowed the challenges, it would have resulted in almost the entire panel having been seated by the court, plainly not a result anticipated by either Batson or Kern (supra).
*279 As to the two jurors in the first round (Nos. 8 and 12) and No. 12 in the second round, this court found the explanations offered by defense counsel to be pretextual, designed to foster the over-all plan to eliminate whites from the jury. Inasmuch as counsel did not seek to place on the record any additional explanation or reason for his peremptory challenges, their disallowance is dispositive. Since no other reason was given, defendant did not satisfy his burden and it would have been improper to excuse or exclude those jurors (see, People v Brown, 193 AD2d 611, supra).
PROCEDURE WHERE BATSON OR KERN CHALLENGE IS SUSTAINED
There remains for consideration the appropriate procedure to be followed where a Batson or Kern challenge is sustained. Two novel issues are raised: (1) May jurors as to whom the court reasonably suspects may have been discriminated against, or as to whom no or a pretextual reason has been given in the exercise of a peremptory challenge, be retained during future rounds of jury selection, in the event what was suspicious in earlier rounds becomes established or glaring in later rounds? and, (2) In the event such jurors who have been discriminated against are to be placed on the jury, in what order are they to be seated? Both questions are of apparent first impression.
(a) Retention of Jurors
In People v Irizarry (165 AD2d 715), a case dealing with discrimination against women in terms of jury selection, the Appellate Division, First Department, recognized that there are various remedies available where discrimination in jury selection persists (supra, at 718): "Where jury discrimination is asserted, various remedies are available including the recalling of the excused jurors, a mistrial, or reversal of the conviction, depending on the point in the proceedings when the issue is raised and the action taken in response thereto * * * Here, defense counsel commendably articulated the concerns about the use of peremptory challenges promptly, at an early stage of jury selection. The appropriate response by the court at that juncture would have been the recalling and reseating of the challenged juror for further inquiry. Instead the court waited until after the jury was impaneled before addressing the issue and denied the mistrial motion without making a *280 specific finding on the critical issue of whether there was a pattern of purposeful discrimination” (emphasis added).
People v Irizarry (supra) is instructive in terms of the remedial action taken by the court in this case. The action taken here, perhaps, was the most conservative and safest approach possible under the circumstances. Had defense counsel not given his reasons for the exercise of peremptory challenges in round 1, which the court found to be patently false and/or pretextual, there would have been no basis to hold the two jurors who had been excused in that round, pending further developments. It was the palpably false responses by defense counsel which prompted the exercise of caution by the court. Inasmuch as the reasons given by defendant were rejected, either as false or contrived, and counsel having failed to offer a further justification, on this record, no reason was advanced for defendant’s having excused those jurors. The absence of an explanation or nonracial basis for the peremptory challenge is dispositive and would require that those jurors be seated should there be a further prima facie showing of discrimination (cf., People v Brown, 193 AD2d 611, supra).
In the usual case, where a Batson or Kern challenge is sustained, and where no reason or explanation is offered for the exercise of peremptory challenges, it is impossible to reach back to earlier rounds, because the jurors who had been excused are no longer in court or available for further inquiry. As noted, in this case, the improper grounds offered by defense counsel rendered necessary the retention of those jurors in the event what was suspicious became clarified in later rounds. This the court recognized when, with respect to the presence of discrimination in round 1, it observed, "It sounds like a duck and it smells like a duck, but I can’t quite see it yet!” It was only then that the court, in the exercise of discretion, directed those jurors to remain, segregated from the balance of the panel and the sworn jurors, should what appeared to be discriminatory conduct rear its ugly head in the future.
(b) Seating of Jurors
When the discriminatory pattern persisted and intensified in the second round, and defendant failed to offer a race-neutral, nonpretextual reason for his peremptory challenges, the Kern objection was sustained, the challenges to jurors Nos. *281 8 and 12 in round 1 and juror No. 12 in round 2 disallowed, and all three seated, respectively, as sworn jurors and first alternate. In doing so, they were placed on the jury in the position and seat they would have occupied had there been no discrimination.
No reported decision has been cited or found dealing with the order by which such jurors are to be seated where a Batson-Kern objection is upheld. A host of problems and related issues could arise, namely, whether the jurors discriminated against should be seated in the remaining seats available when the challenge is sustained, in lieu of the position they would have occupied had there been no discrimination. A further issue relates to the procedure to be followed and action to be taken in a situation where there are insufficient seats to accommodate those prospective jurors who had been discriminated against. Illustrative of the type of issues which a court could confront are the following: If all seats on the jury have been taken, should the jurors discriminated against be seated as alternates? May other jurors already selected be moved, in terms of their seats and/or their status as a juror or alternate, in order to accommodate such jurors discriminated against? Does permission for such movement depend upon whether jurors already selected have been sworn in earlier rounds?
Conceivably, if jurors are to assume the positions they would have had if there had been no discrimination, it could require removing from the panel jurors who had been selected before the Batson-Kern challenge was sustained. While one might consider this to be unfair, it would nevertheless be consistent with the underlying principle embodied by both Batson and Kern (supra), to prevent discrimination in the selection of a jury, and could provide an added dimension of enforceability.
To hold otherwise would inadvisably reward a party for his own improper conduct, as would the declaration of a mistrial, which, in my view, is an inappropriate remedy where the court is confronted with a valid Batson or Kern challenge. The declaration of a mistrial, as an alternative to a difficult decision involving a remedy for a Batson or Kern violation, merely avoids the critical issue and is inappropriate since such a declaration would give the offending party exactly what he wanted, namely, a different jury panel. Thus, it would reward him for the very discrimination which Batson and Kern (supra) were designed to prevent.
*282 Hopefully, as these and other issues are considered in the future, our appellate courts will provide needed guidance. In its absence, however, the trial courts must continue to deal with the issue on a case-by-case basis, with due consideration for the underlying principle of both Batson and Kern (supra). Plainly, those cases preclude purposeful discrimination in the selection of a jury, which not only violates the defendant’s due process and equal protection rights when practiced by the prosecution, but also, when committed by defense counsel, impinges upon the civil rights of citizens, which includes jury service as a privilege of citizenship and as a means of participation in government.
CONCLUSION
Without doubt, racial discrimination has no place in the selection of a jury in any court of law. In a case like the present one, where the existence and pattern of discrimination is readily apparent, the very integrity of the jury selection process and criminal justice system demands prompt, direct, affirmative and effective remedial action. In my view, appropriate relief was accorded here, by seating those jurors discriminated against in the first and second rounds in the same seats and positions they would have assumed if there had been no discrimination. This was done as soon as the pattern of discrimination clearly appeared and defendant failed to offer justification for his challenges, other than those found to be pretextual. Although one might argue that the court could have done so sooner, at an earlier time in the selection process, and could have found additional jurors to have been discriminated against as well, any such critiques would be unavailable to this defendant and would not, in any way, affect his right to a fair trial.
Accordingly, the prosecutrix’ objection under People v Kern (supra) is sustained to the extent of disallowing defendant’s peremptory challenges to jurors Nos. 8 and 12 in round 1, and juror No. 12 in round 2 and those jurors are to be seated as sworn jurors and first alternate, respectively, in the same position and seat each would have occupied had there been no discrimination. That this required the moving of one sworn juror from seat 5 to seat 7, and the seating of one juror as an alternate, action necessary in order to give the full effect to the Batson-Kern ruling, is without dispositive effect. Defendant’s rights were not, in any way, abridged by this court’s *283 adherence to the constitutional principles embodied by Batson v Kentucky (supra) and People v Kern (supra) nor from the relief deemed to be necessary in order to preserve the very integrity of those ideals which form the heart of the criminal justice system.