■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KENNETH CUNNINGHAM, Appellant. [800 NYS2d 550]—

Judgment, Supreme Court, New York County (Gregory Carro, J.), rendered June 18, 2003, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree, and sentencing him, as a second felony offender, to a term of 5 to 10 years, affirmed.

Upon his conviction for possession with intent to sell narcotics, defendant raises four arguments for reversal: the prosecutor exercised peremptory jury challenges in a racially discriminatory manner; his conviction was against the weight of the evidence; the prosecutor was guilty of misconduct during opening and closing statements; and the court's adverse inference instruction was an inadequate sanction for lost *Rosario* material. None of these arguments justify reversal of the conviction.

Defendant makes two distinct arguments on appeal concerning the *Batson* issue (*see Batson v Kentucky*, 476 US 79 [1986]). First, he contends that the trial court erred in failing to complete the third step of the *Batson* inquiry by announcing, after the prosecutor had given his reasons for the strikes, that those reasons were "legitimate race neutral explanations." We disagree. After the court made the above ruling, defense counsel asked for an opportunity to respond and the court stated, "I don't think it's necessary, but if you want to make some type of record, go ahead." After counsel made his pretext argument as to the four jurors, he concluded: "So I have made my burden, but they haven't carried those [*sic*], and I ask that each of those four individuals be seated." The court ruled: "That is denied."

Although the court's language suggested that it had already decided that the challenges were proper, the fact remains that defense counsel did have the opportunity to make his pretext arguments, after which the court issued a new ruling denying the *Batson* motion. Thus, unlike the situation where a defendant is deprived of the opportunity to assert pretext, here the court made two distinct rulings: the first, that the reasons were "legitimate[ly] race neutral," and the second, that the *Batson* motion was denied, with the latter constituting an implicit finding of no pretext (*see People v Pena*, 251 AD2d 26, 34 [1998], *lv denied* 92 NY2d 929 [1998]; *People v Wint*, 237 AD2d 195 [1997], *lv denied* 89 NY2d 1103 [1997]). Even if the court made a premature ruling on pretext, its later ruling, after hearing from defense counsel, effectively constituted a reconsideration and defendant was not prejudiced thereby.

The second *Batson* issue concerns the court's rulings on the third step of the *Batson* inquiry regarding prospective jurors Bihui, St. Fleur, Reid and Brown, who were all African-Americans. With respect to Mr. Bihui, the prosecutor stated: "[H]e seemed to have conflicting feelings about police officers. He said that in some cases he thinks police officers would want to cover their butts during their testimony, which I interpreted as meaning may lie if put to the test . . . ."

In response, defense counsel stated "[s]o what if Mr. Bihui feels, as most reasonable people would, that some people might lie, whether they are police officers or not, to cover their butts, as he put it." Counsel went on to note that the issue of "good cops and bad cops" had been explored with both panels, and that police officers had to be evaluated on a "case by case basis."

We see no basis to overrule the trial court's determination that the reasons given for challenging Bihui were not pretextual. While it is true Bihui stated that he would assess police officers on a "person by person basis," it was not unreasonable for the prosecutor to be concerned that Bihui's "cover their butts" statement suggested a more deep-seated mistrust of police officers as witnesses. Contrary to the dissent's suggestion, the prosecutor was not required to accept the prospective juror's statements at face value. Indeed, an evaluation of the credibility of the juror's responses is one of the core purposes of voir dire. A trial court's determination of no pretext is entitled to great deference on appeal (*see People v Hernandez*, 75 NY2d 350, 356 [1990], *affd* 500 US 352 [1991]) and there is no basis in this record to disturb that finding.

In concluding that the reasons for challenging Bihui were pretextual, the defendant and the dissent rely on comparisons to two jurors, August and Lipton, questioned in the third round of voir dire (i.e., the round after defendant's *Batson* motion). However, defendant's argument based upon these comparisons is unpreserved for appellate review, and we decline to review it in the interest of justice (*see People v Allen*, 86 NY2d 101, 110-111 [1995] [arguments concerning uneven application of neutral factors must "be fully articulated to the trial court during its factual inquiry"]). Defendant never raised the comparison between Bihui and these two jurors at the *Batson* hearing (nor could he have, since the third round had not yet occurred). "It is . . . the moving party's burden to make a record that would support a finding of pretext" (*People v Smocum*, 99 NY2d 418, 422 [2003]), and the trial court's *Batson* determination must be evaluated solely on the record existing at the time the objection is made. Accordingly, since defense counsel never mentioned

these two jurors during the *Batson* hearing (*see People v Wainwright*, 11 AD3d 242, 244 [2004], *lv denied* 4 NY3d 749 [2004]; *People v Funches*, 4 AD3d 206, 207 [2004], *lv denied* 3 NY3d 640 [2004]), nor had they even been questioned yet, they are irrelevant to this *Batson* application.*

As to the second juror, St. Fleur, the prosecutor asserted that he challenged him because "he also had not overwhelming positive interactions with police officers" in connection with an apartment break-in and "he wasn't apparently satisfied with the response of the police." In response, defense counsel stated: "St. Fleur . . . may not have had an overwhelming positive police attitude. The same can be said for many of the potential white jurors the DA did not strike."

Although defendant never compared St. Fleur's situation to any specific juror at the *Batson* hearing, on appeal he argues that juror Netzer, a non-African-American questioned in the same round, was similarly situated to St. Fleur in that both had been victims of burglaries and both had been disappointed with the response of the police. While there were some similarities between the two jurors' situations, there were also some differences in their experiences as well as the tone of their responses (*cf. Miller-El v Dretke*, 545 US — , 125 S Ct 2317 [2005]). With respect to St. Fleur, the court questioned him about the burglary of his apartment:

"THE COURT: Were you satisfied with the response you got from the police?

"JUROR: No.

"THE COURT: Okay. Anything about that—

"JUROR: Just took a report.

"THE COURT: Okay. Anything about that experience that will prevent you from being fair and impartial?

"JUROR: No."

With respect to Netzer, the prosecutor questioned him on two separate occasions about his dealings with the police regarding two burglaries and one car break-in:

"PROSECUTOR: And what was—I believe you said you weren't satisfied with the response by the police? Did they follow-up with you at all?

"JUROR: No. . . .

"PROSECUTOR: And were any of the perpetrators caught?

"JUROR: No.

---

* We also note that defendant could have reasserted, but did not, the *Batson* objection after the questioning of these two jurors in the third round.

"PROSECUTOR: And how did that feel?

"JUROR: Well, I thought with break-ins to the apartment they were very, very thorough and they seemed to be very interested in helping. But the car thing, it was a little disappointing. It was kind of an old car, but someone put a traffic ticket on it, but they didn't know it was stolen, so I thought if they would have connected through cross-reference they would have found the car."

Based on this record, there was a rational reason to challenge juror St. Fleur, but not Netzer. Netzer had three separate instances of dealing with the police as a crime victim, and was "very, very" satisfied on two of those occasions. While he found the failure to locate his stolen car "a little disappointing," on balance the prosecutor could fairly conclude that Netzer had a favorable view of the police. In contrast, St. Fleur's answers regarding the police were curt and unconditional in their disapproval, without any mention of any positive aspects of their work. Although defendant accuses the prosecutor of failing to question St. Fleur as much as Netzer, Netzer's multiple contacts with the police provided a legitimate reason for doing so. Recognizing again that it is the movant's burden to demonstrate that the prosecutor's race-neutral reasons were not merely unsatisfying, but actually were a pretext for discrimination, the trial court's finding of no pretext as to St. Fleur should not be disturbed.

With respect to juror Reid, the prosecutor challenged her because "she had earlier . . . spoken about two of her nephews were drug addicts and one was in prison . . . [a]nd even though she assured the Court at that point that she can be fair and impartial, I still think it's a little too close to this case as far as the drug issue is concerned." In response, defense counsel noted that juror Netzer had a nephew who was imprisoned in Oregon "yet that did not cause the People to seek to strike him," while at the same time "the fact that Ms. Reid has one or two nephews who have been convicted somehow causes the DA to reject her for that reason."

Earlier in the voir dire proceeding, Netzer disclosed that he had a nephew who was recently convicted of assault in Oregon or Idaho, but that he knew little about the crime and had only met the nephew a few times. He further stated that he assumed the nephew had been treated fairly because "I think probably he was guilty because he was a very troubled child. . . ." Reid, on the other hand, had two nephews who were drug addicts, one of whom was in prison "Upstate." She further stated that she could put those facts aside and decide the case on the evi-

dence, but did admit that one of her nephews had been beaten by the police.

Despite the fact that both of these jurors had family members that had been convicted of a crime, the fact that Reid had nephews involved in drugs provided an additional, independent basis to challenge her. Notably, the prosecutor specifically relied on the nexus between the nephews' drug addiction and this drug prosecution in challenging juror Reid, as opposed to the fact that her nephew had been convicted of a crime (as had Netzer's nephew). Although the dissent faults the prosecutor for not making further inquiry as to Reid's feelings toward the police, the record discloses precisely such an inquiry after the beating of her nephew was disclosed. There is no basis in the record to discredit the prosecutor's stated belief that Reid's impartiality might be compromised since her nephews' drug addiction was "a little too close to this case."

Regarding juror Brown, the prosecutor stated that she challenged her because "she said she had two nephews who had been convicted for assault and murder in Bronx and New York County and I believe that her work involves a lot of families with drug problems." In response, defense counsel noted that after Brown informed the court and counsel of the issues involving her nephews, the prosecutor never questioned her about them and never challenged her for cause. Notably, defense counsel never mentioned the issue of employment-based challenges before the trial court.

The voir dire record discloses that in response to a question from the prosecutor, Brown stated that her work at the Administration for Children's Services involved removing a child "for neglect or abuse." The prosecutor then asked, "Are a large percentage of the cases that you deal with involving neglect or abuse? Would you say a large amount of them involv[e] households where there are people with drug problems?" Brown responded, "Some, some, yes."

Defendant's argument concerning employment-based challenges is unpreserved for appellate review since it was never raised before the trial court (*People v Allen*, 86 NY2d at 110-111), and we decline to review it in the interest of justice. If it were reviewed, we would reject it as there is a logical connection between Brown's work involving persons with drug problems and the prosecutor's belief that such work might compromise her impartiality in a drug prosecution (*People v Funches*, 4 AD3d at 207; *People v Wint*, 237 AD2d at 197-198).

Defendant's remaining arguments for reversal are likewise without merit. The verdict was not against the weight of the ev-

idence. Issues of credibility, including the weight to be given to any inconsistencies in testimony, were properly considered by the jury, and there is no basis for disturbing its determinations (*see People v Gaimari*, 176 NY 84, 94 [1903]). There was nothing implausible about the detective's account of the drug transaction.

The court's delivery of an adverse inference instruction to the jury as a result of the People's loss of a DD5 report was a proper exercise of discretion (*see People v Martinez*, 71 NY2d 937, 940 [1988]). Preclusion of the undercover officer's testimony was unwarranted. Although the language of the adverse inference charge mentioned in some of the case law is preferable to the instruction given here (*see e.g., People v Davis*, 18 AD3d 1016, 1018-1019 [2005]), the charge as a whole adequately sanctioned the People for the loss of *Rosario* material.

Although several of the prosecutor's comments in her opening statement and summation strayed from the evidence and, on one occasion, improperly denigrated defense counsel, such comments did not deprive defendant of a fair trial. Concur— Sullivan, Williams and Gonzalez, JJ.

Mazzarelli, J.P., and Catterson, J., dissent in a memorandum by Catterson, J., as follows: I disagree with the majority's application of the *Batson v Kentucky* test to the case at bar. I, therefore respectfully dissent.

The defendant was arrested by an undercover police officer who observed him selling drugs. After the defendant refused to sell to the undercover, he was arrested in possession of a quantity of crack cocaine. The defendant was convicted by a jury and now appeals arguing, inter alia, that the court improperly denied defendant's application pursuant to *Batson v Kentucky* (476 US 79 [1986]).

The Supreme Court in *Batson v Kentucky* held that the Equal Protection Clause of the Fourteenth Amendment forbids the use of peremptory challenges solely for discriminatory purposes, such as to purposely exclude persons of a particular race from serving on a jury (*id.*) Such discriminatory use of peremptory challenges also violates the Equal Protection Clause of our State Constitution (NY Const, art I, § 11; *see People v Kern*, 75 NY2d 638, 649 (1990]). Our system of jury service is rooted in the privilege and duty of citizenship, secured to each citizen by the State Constitution (NY Const, art I, § 1). "Racial discrimination in the selection of juries harms the excluded juror by denying this opportunity to participate in the administration of justice." (*People v Kern*, 75 NY2d at 652, citing *Batson v Kentucky*, 476 US at 87-88.) The Court recognized that to exclude a juror on

the basis of race denies not only the juror equal protection but the defendant as well because it denies the accused the protection that a trial by jury is intended to secure. (*Id.*) The injury to the criminal justice system and society in general is no less abhorrent: "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others' " (*Batson v Kentucky*, 476 US at 87-88 [citations omitted], quoting *Strauder v West Virginia*, 100 US 303, 308 [1879].)

To determine if a defendant's rights have been violated, a *Batson* analysis requires the court to conduct a three-step test (*People v Smocum*, 99 NY2d 418, 420 [2003]). The first step is to determine whether the moving party has made a prima facie showing that the nonmoving party has exercised its peremptory challenges for discriminatory purposes. (*Id.*) If so, the nonmoving party must proffer a race-neutral explanation for each potential juror challenged. In the third step, finally, the court must determine whether the reasons proffered are simply a pretext for discrimination. (*Id.*)

The court is not unmindful of the difficulties faced by the prosecution in articulating "gut feelings" regarding potential jurors. Not every challenge is susceptible to a ready explanation, nor should the prosecution be required to simply and concisely explain each challenge. However, in the case before us the defendant, an African-American, has clearly made a prima facie showing of discrimination by demonstrating that the prosecutor used peremptory challenges to exclude every black member of the venire in the second round of voir dire.[1] While percentages alone may not be sufficient to demonstrate a prima facia case of discrimination, if the number of peremptory strikes exercised against members of a cognizable racial group is sufficiently disproportionate, it can give rise to an inference of discrimination.(*People v Bolling*, 79 NY2d 317, 324 [1992].)

In response to the defendant's motion, the prosecution proffered the following regarding the four members of the venire in issue: Mr. Bihui had "conflicting feelings about police officers. He said that in some cases he thinks police officers would want

---

1. The four venire members were Mihui Bihui, Gary St. Fleur, Dora Reid and Carolyn Brown.

to cover their butts during their testimony, which I interpreted as meaning may lie if put to the test;" Mr. St. Fleur's "interactions with police officers" were not "overwhelmingly positive" after the police responded to his apartment break-in; Ms. Reid had two drug-addicted nephews; and, Ms. Brown had two nephews that had been convicted of felonies and her work involved families with drug problems.

The court erred in finding these explanations nonpretextual. While facially race neutral, the prosecutor's reasoning was a pretext for discrimination. Then the pretext is particularly apparent since Bihui's statements were very similar to those of white panelists who were either seated on the jury or not challenged by the prosecutor. Indeed, Bihui stated that police officers were no more likely to lie than civilians, that there were good and bad police, and that while the police sometimes "cover" themselves, he could assess the credibility of a police officer on a "person by person" basis. The implication of his remarks is no different than that of the statements made by a white juror, Jane August, who was not challenged by the prosecutor, even though she too agreed that there were good and bad police officers,[2] and that she could assess the credibility of the police officers involved in this case without being tainted by her prior experience with them. Similarly, a seated white juror, Brian Lipton, told the prosecutor that he had been robbed at gunpoint, that his case was "unresolved" and that he did not find that the police did a good or bad job. In addition, the prosecutor did not explore the issue of bias or prejudice against the police with either of these white panelists as she did with Bihui.

The proffered reason for striking St. Fleur was also pretextual as a white panelist, William Netzer, who was not challenged by the prosecutor (but ultimately challenged by defendant), stated that he was also not satisfied with the police response when he was the victim of a crime. Both Netzer and St. Fleur noted that their past experience with the police would not prevent them from being fair and impartial. Thus, there is no reason to believe, given their similar responses and circumstances, that Netzer would have been impartial while St. Fleur would have been biased against the police. Yet, the prosecutor challenged only St. Fleur, who was African-American.

Furthermore, the People's challenge to Reid evinced pretext.

---

**2.** Jane August, who was challenged by the defendant ultimately, stated that her father had been arrested many years earlier. She said that "[w]hat happened was, the police took a certain amount of money so he wouldn't have to spend the first couple of nights in jail."

The prosecutor challenged her on the basis that she had two nephews who were drug addicts, one of whom was in prison.[3] Reid stated that she did not know about her nephew's case and that he had been away for "quite sometime." Indeed, she did not know whether there was even a trial. Nevertheless, the prosecutor stated that "even though she assured the Court at that point that she can be fair and impartial, I still think it's a little too close to this case as far as the drug issue is concerned." Reid, however, when questioned by the court agreed unequivocally that she could assess the police officers in this case "without giving them more or less credibility because of their occupation as a police officer," that she could keep an open mind, that there are good and bad police officers, and emphatically denied that she would have a hard time separating what happened to her nephews from this case. She also stated that there was no reason why she could not be impartial.

There was simply no basis for the prosecutor's remarks challenging Reid, especially given that Netzer, a white panelist discussed above, stated that he had a nephew in prison that he, just as Reid, did not have a close relationship with. While Netzer's nephew was imprisoned for assault and not for a drug crime, he was also asked whether this experience would prevent him from being fair and impartial. Similar to Reid, he replied, "I doubt it, no" and assured the court that he could be fair. Yet, Netzer was not challenged by the prosecution.

Moreover, far from exploring the issue of Reid's feelings toward the police, the prosecutor merely asked Reid if there was anything about the questions asked that made her "think about how [she] would feel sitting on this case" to which Reid responded "no." By contrast, the prosecutor asked Netzer several questions about his feelings regarding the police.[4]

Finally, the reason for striking Brown, while facially race-neutral, was shown to be a pretext. The prosecutor rejected Brown because she had two nephews convicted of violent crimes and because "her work involves a lot of families with drug problems." When questioned by the court, Brown stated that her nephews were treated fairly by the police, and emphatically

---

3. Reid also said that she knew nothing about the other nephew and that the imprisoned nephew was not treated fairly by the police in that he was beaten ("one's eye was beaten out"). The prosecutor, however, did not proffer the alleged police misconduct as a reason to strike her from the panel.

4. That Netzer's questioning concerned his status as a crime victim does not alter the fact that the prosecutor showed no interest in exploring if Reid had negative feelings toward the police, thus demonstrating that the prosecutor merely assumed partiality or bias with no discernible basis.

agreed that she would be able to decide this case on the evidence presented.[5] Furthermore, the convictions took place 15 years ago. As stated above, Netzer had a nephew convicted of a violent crime, yet he was not challenged by the People.

An additional reason put forth for the challenge was Brown's occupation. The prosecutor's reasoning is unclear as to how her role in the Administration for Children's Services (ACS), in which she was involved in removing children from their homes because of abuse or neglect, caused her to be unsuitable to be a juror. The prosecutor merely asked her if there were "a large amount" of households involved in her work in which the people had drug problems, and she responded "Some, some, yes." The prosecutor then asked what were her feelings about "those situations," and whether she felt that people who need help can be rehabilitated. Brown replied that anybody can be rehabilitated. There was nothing in her response that indicated that she worked with "*a lot* of families with drug problems," or that somehow her work made her biased against the police or in favor of the defendant.

Moreover, the prosecutor failed to establish a link between Brown's job and the facts of this case, much less a link that might engender bias in Brown. (*See People v Jackson*, 213 AD2d 335, 336 [1st Dept 1995]; *People v Bennett*, 206 AD2d 382 [2d Dept 1994], *lv denied* 85 NY2d 859 [1995].)[6] One of the significant factors in determining whether a proffered reason is discriminatory is to examine if the reasoning has been applied consistently. (*People v Rodriguez*, 211 AD2d 275, 279 [1st Dept 1995].) In the case at bar, the prosecution has not applied its reasoning consistently as similarly situated white jurors were either not challenged or were seated while African-American jurors were improperly excluded.

5. Indeed, when asked by the court if she could put her nephews' situation out of her mind and decide the case solely on the evidence presented she replied "of course."

6. Indeed, it could be assumed that Brown's position with a government agency would sway her to the prosecution's side. (*See People v Childress*, 81 NY2d 263, 267 [1993].)